[No. S031593. Mar. 31, 1994.]

SANTA CLARA COUNTY COUNSEL ATTORNEYS ASSOCIATION,
Plaintiff, Cross-defendant and Respondent, v.
STEVEN WOODSIDE, as County Counsel, etc., Defendant,
Cross-complainant and Appellant;
COUNTY OF SANTA CLARA, Defendant and Appellant.

COUNSEL

Remcho, Johansen & Purcell, Robin B. Johansen, Joseph Remcho, Karen A. Getman and Philip C. Monrad for Defendant, Cross-complainant and Appellant and Defendant and Appellant.

Daniel S. Hapke, Jr., Frederick J. Krebs, O'Melveny & Myers and George A. Riley as Amici Curiae on behalf of Defendant, Cross-complainant and Appellant and for Defendant and Appellant.

Pillsbury, Madison & Sutro, Kevin M. Fong, Edward P. Davis and J. Donald Best for Plaintiff, Cross-defendant and Respondent.

Daniel F. Moss, Ann Brick, Edward M. Chen, Matthew A. Coles, Margaret C. Crosby and Alan L. Schlosser as Amici Curiae on behalf of Plaintiff, Cross-defendant and Respondent.

## OPINION

**MOSK, J.**—We are asked to decide whether the right of local government employees to sue a public agency for violations of the Meyers-Milias-Brown Act (MMBA, Gov. Code, § 3500 et seq.) extends to attorneys who are employed in the office of the Santa Clara County Counsel (County Counsel), or whether the duty of loyalty imposed upon these attorneys towards their client, the County of Santa Clara (County), precludes such a suit. We conclude that the MMBA authorizes the suit, and that the suit is not prohibited for any constitutional reason. Further, we conclude that the County is statutorily forbidden from discharging attorneys for exercising their right to sue under the MMBA, although the County is still free to rearrange assignments within the County Counsel's office in order to ensure that it receives legal representation in which it has full confidence. Because

we find in favor of the Santa Clara County Attorneys Association on statutory grounds, we do not consider the argument that their right to sue is constitutionally protected.

## I. *Factual Background*

Petitioner Santa Clara County Counsel Attorneys Association (Association) consists of approximately 20 out of 40 attorneys (Attorneys) in the County Counsel's office. The County Counsel's office, by statute (Gov. Code, § 26526) and by practice, acts as the primary legal adviser to the County Board of Supervisors. In addition to serving as counsel to the board, deputies in the County Counsel's office advise and represent various administrative departments of the county in matters ranging from land use law to social service benefits. The County Counsel's office is also charged with representing special districts within the county (*id.*, § 27645), representing the state at guardianship proceedings (*id.*, § 27646), and representing superior and municipal court judges (*id.*, § 27647).

In order to understand the relevant circumstances of this case, it is helpful to recount briefly the history of the Association.

In 1973, the Santa Clara County Criminal Attorneys Association, which included deputy district attorneys and deputy public defenders, filed a petition to form an attorney bargaining unit, pursuant to provisions of the MMBA. The County Board of Supervisors (the Board) placed the deputy County Counsel attorneys in the same bargaining unit as these attorneys. At the same time, the County removed the attorneys' status as classified employees who, under the MMBA, have certain restrictions placed on their associational rights. (See Gov. Code, § 3507.5.) However, the following year, the deputy County Counsel attorneys petitioned to be placed in a separate bargaining unit. The stated reason for the petition was that the attorneys, unlike the deputy district attorneys and public defenders, were in a "confidential attorney-client relationship with the Board of Supervisors and county management," and therefore "should not be included with attorneys and others not in such a relationship." The petition was granted, and the Association became a recognized employee association under the MMBA.

There is evidence in the record that in the late 1970's the Association attempted to change the status of its members, in effect proposing to disband them as a bargaining unit in exchange for a salary increase 5 percent greater than those of the deputy district attorneys and deputy public defenders. These latter attorneys objected and the proposal was never adopted.

In 1984, the Association joined the deputy public defenders and deputy district attorneys' unit in a lawsuit against the County. At issue was whether

the County was setting the attorneys' salaries in accordance with the comparable wage provisions of County Charter section 709, and whether the County was violating the MMBA, specifically Government Code section 3505's requirement that a public employer "meet and confer in good faith regarding wages, hours, and other terms and conditions of employment . . . ." The suit was subsequently settled.

This brings us to the events leading to the present lawsuit. In 1989, the most recent memorandum of understanding between the County and the Association expired. The Association refused to accept a wage package already approved by the deputy public defenders. Instead, the Association sought to meet and confer independently with the County and the Board to present its own comparative survey data, to support its position that its members deserved higher salaries than those offered by the County. On August 17, 1989, the Association requested that the Board schedule a hearing to set salaries pursuant to County Charter section 709. The Board did not comply with that request. On September 1, 1989, the Association proposed that the rate of pay for its members be set by binding arbitration. The County again did not respond. In November 1989, the County notified the Association that it intended to give the Attorneys the first phase of the increase negotiated with other attorneys. The County offered to meet and confer with them on the implementation of this increase. On December 8, 1989, the Association proposed nonbinding fact-finding by a neutral third party or any other reasonable procedure that would assist the parties in resolving the comparable wage issue. Once again the County did not respond.

In December 1989, the Board enacted its 4 percent wage increase for the Attorneys. The Association at that point notified the County of its intent to file a petition for writ of mandate to enforce its rights under the MMBA and the County Charter. On December 21, 1989, Steven Woodside, the County Counsel, distributed a memorandum to all deputies in the office, setting forth his position with regard to the impending writ action. After a review of various California Rules of Professional Conduct as well as the American Bar Association model rules, Woodside concluded that "litigation against the County on these issues may not be maintained by lawyers employed by the County unless the lawyers cease employment in the County Counsel's Office or the County consents." Moreover, Woodside took certain steps to segregate Association members from confidential meetings and contacts with the Board.

On December 29, 1989, the Association requested that the County waive the conflict of interest or submit the controversy to a court without the filing

of a formal action, pursuant to Code of Civil Procedure section 1138. After the County's rejection of this proposal, the Association filed this formal action for declaratory and injunctive relief. The Association alleged that the County had failed to meet and confer on wages, as it is obliged to do under the MMBA, and failed to adjust salaries in accordance with County Charter section 709. Subsequently, the County filed a cross-complaint seeking to enjoin the Association from filing a petition for writ of mandate or, in the alternative, seeking a declaration that prior to filing the petition, the Association be required to make a showing (1) that there is a likelihood of prevailing on the merits, and (2) that harm to the County would be minimal.

The Association asked the court to grant the following relief: (1) to declare that the members of the Association do not have to resign prior to filing a petition for writ of mandate against the County over the wage issue; (2) to declare that such a writ of mandate action does not create a conflict of interest or violate any ethical code which would subject the Attorneys to discipline; (3) for an injunction prohibiting the County from preventing the Attorneys from performing their customary duties, from disciplining or terminating the Attorneys, or from referring the Attorneys to the State Bar for discipline; and (4) to reinstate the Attorneys to their full employment responsibilities, including confidential meetings with the Board and other County policymaking officials. It is worthy of emphasis that the underlying merits of the petition for writ of mandate sought by the Association were not before the trial court, and are not before this court. The only issues argued in the court below were whether the Association's contemplated petition was lawful, and whether it could proceed without discipline from either the County or the State Bar. Those are the only questions we decide here.

The trial court found for the Association on most points. It enjoined the County from terminating the Attorneys for filing a writ of mandate action to resolve the salary dispute. It further declared that the members of the Association did not have to resign in order to file the suit, and that the filing of a petition for writ of mandate did not create any conflict of interest in violation of the Attorneys' ethical code. It declined to enjoin the County, however, from reassigning attorneys so as to exclude them from confidential meetings.

The County appealed. The trial court stayed its judgment pending appeal, but left in effect a preliminary injunction preventing the County from terminating any of the Attorneys for filing the suit. The Court of Appeal reversed, finding in essence that the Association's suit did indeed present a grave breach of the Attorneys' duty of loyalty to their clients. The Court of

Appeal found, moreover, that the MMBA did not authorize the Attorneys to file the petition. We granted the Association's petition for review to resolve this important question of first impression.

## II. *Discussion*

In support of the Court of Appeal's holding, the County advances two lines of argument against the Association's right to sue. The first of these is a statutory/common law argument based on a construction of the MMBA. The second is a constitutional argument based on the separation of powers between the legislative and judicial branches of government. The constitutional argument claims in substance that the MMBA as applied to these attorneys permits them to violate their settled ethical obligations, and that therefore the statute is in that respect unconstitutional. Each of these arguments will be considered in turn.

### A. *Statutory Arguments*

The Association contends that the Court of Appeal erred when it held that the Attorneys had no right to sue under the MMBA. The County, on the other hand, argues that the MMBA contains no explicit right to sue. It contends that the remedies available to grievants under the MMBA are essentially common law actions created by the courts. The County further maintains that there are compelling public policy reasons for not extending the common law right to sue to attorneys who, as here, are involved in an attorney-client relationship with their employers. The primary public policy reason against allowing such suits is that they would cause an attorney to violate his or her duty of loyalty to the client.

We disagree with the fundamental premise of the County's argument. We construe the MMBA to provide a right to petition for writ of mandate to those employees who fall within its protections, including the Attorneys in the present case. Therefore this court has no discretion to deny that remedy on public policy grounds, however strong those grounds may be.

### 1. *Scope of Coverage Under the MMBA*

The MMBA was adopted in 1968, after several more modest attempts to regulate labor relations for local government employees. Its stated purpose is to provide "a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment . . . ." (Gov. Code, § 3500.) ■ Its principal means for doing so is by imposing on public agencies the obligation to "meet and confer in good faith regarding wages,

hours, and other terms and conditions of employment with representatives of recognized employee organizations. . . ." (*Id.*, § 3505.) The duty to meet and confer in good faith has been construed as a duty to bargain with the objective of reaching binding agreements between agencies and employee organizations over the relevant terms and conditions of employment. (*Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 336 [124 Cal.Rptr. 513, 540 P.2d 609].) The duty to bargain requires the public agency to refrain from making unilateral changes in employees' wages and working conditions until the employer and employee association have bargained to impasse; this duty continues in effect after the expiration of any employer-employee agreement. (*San Joaquin County Employees Assn.* v. *City of Stockton* (1984) 161 Cal.App.3d 813, 818-819 [207 Cal.Rptr. 876].)

The MMBA explicitly includes attorneys within the scope of its protections. Government Code section 3507.3 states that "Professional employees shall not be denied the right to be represented separately from nonprofessional employees by a professional employee organization . . . . [¶] 'Professional employees' for the purposes of this section, means employees engaged in work requiring specialized knowledge and skills attained through completion of a recognized course of instruction, including, but not limited to, *attorneys*, physicians, registered nurses, engineers, architects, teachers, and the various types of physical, chemical, and biological scientists." (Italics added.)

Moreover the MMBA, unlike federal labor law, includes supervisory, management and confidential employees within its scope. "Contrary to federal practice, by virtue of the broad definition of 'public employee' in section 3501, subdivision (d), which excludes only elected officials and those appointed by the Governor, MMBA extends organizational and representation rights to supervisory and managerial employees without regard to their position in the administrative hierarchy." (*Organization of Deputy Sheriffs* v. *County of San Mateo* (1975) 48 Cal.App.3d 331, 338 [122 Cal.Rptr. 210].) Government Code section 3507.5 permits a public agency to adopt rules for the designation of management and confidential employees, and for "restricting such employees from representing any employee organization, which represents other employees of the public agency," but does not prohibit such employees from forming, joining or participating in an employee organization.

Thus, under federal labor law, the Attorneys in this case may well have been excluded from union representation because they would be classified as

management employees who " ' "formulate and effectuate management policies by expressing and making operative the decisions of their employer." ' " (*NLRB* v. *Yeshiva University* (1980) 444 U.S. 672, 682 [63 L.Ed.2d 115, 125, 100 S.Ct. 856].) The purpose for the managerial exclusion, as the Supreme Court explained, was to prevent a situation whereby employees would be tempted to "divide their loyalty between employer and union." (*Id.* at p. 688 [63 L.Ed.2d at p. 129].) The attorneys, or some of them, might have also been excluded under federal law as confidential employees who " 'assist and act in a confidential capacity to persons who exercise "managerial" functions in the field of labor relations.' " (*NLRB* v. *Hendricks Cty. Rural Electric Corp.* (1981) 454 U.S. 170, 180-181 [70 L.Ed.2d 323, 332, 102 S.Ct. 216].)

But under the MMBA neither exclusion is applicable. By choosing to explicitly include supervisorial, managerial, and confidential employees within the realm of the MMBA's protections, the Legislature implicitly decided that the benefits for public sector labor relations achieved by including managerial employees outweighed the potential divided loyalty dilemmas raised.[1] We therefore note at the outset that any argument which contends that MMBA protections should not apply to certain managerial employees because of problems with divided loyalty must be viewed with skepticism, for that argument follows precisely the legislative road the MMBA declined to take.

### 2. *The Right to Sue Under the MMBA*

The County's statutory argument is premised on what it considers the lack of an express right to sue under the MMBA. Its argument begins with our statement in *International Brotherhood of Electrical Workers* v. *City of Gridley* (1983) 34 Cal.3d 191, 197 [193 Cal.Rptr. 518, 666 P.2d 960] (hereafter *City of Gridley*), that the MMBA "furnishes only a 'sketchy and frequently vague framework of employer-employee relations for California's local government agencies.' [Citation.] A product of political compromise, the provisions of the act are confusing, and, at times, contradictory." From there, the County points to the lack of any stated right to sue under the MMBA, and concludes that "the Legislature deliberately left important provisions of the Act to court interpretation, including any provisions for enforcement."

---

[1]We note that the inclusion of managerial employees within the MMBA has been maintained in spite of opposition from public employers and in spite of legislative committee recommendations. (See Sen. Select Com. on Local Public Safety Employment Practices Rep., To Meet and Confer: A Study of Public Employee Labor Relations (1972) p. 31.)

Such an argument fundamentally misconstrues the statutory protections afforded by the MMBA. As we stated in *City of Gridley, supra,* 34 Cal.3d at page 198: "Notwithstanding its otherwise 'sketchy' provisions, the act contains strong protection for the rights of public employees to join and participate in the activities of employee organizations, and for the rights of those organizations to represent employees' interests with public agencies." Thus, in spite of the fact that the language of the MMBA, read literally, can be construed to provide no more than "a rather general legislative blessing for collective bargaining at the local governmental level without clear delineation of policy or means for its implementation" (Grodin, *Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts* (1972) 23 Hastings L.J. 719, 761), we have consistently held that the Legislature intended in the MMBA to impose substantive duties, and confer substantive, enforceable rights, on public employers and employees. (See *City of Gridley, supra,* 34 Cal.3d at p. 202 [local government agencies may not adopt labor relations regulations in conflict with provision of the MMBA]; *Glendale City Employees Assn., Inc. v. City of Glendale, supra,* 15 Cal.3d 328, 337-338 [memorandum of understanding between public employer and employees negotiated under the MMBA is enforceable and binds the discretion of city council].)

That being the case, the County's assertion that the MMBA contains no *express* right to sue is irrelevant. The Legislature, in order to create a right to sue under the MMBA, need not have included language concerning the right to sue within the act itself. It was enough for the Legislature to endow the public employers and employees with substantive rights and duties which limited public employers' discretion, and then to allow employees to enforce their rights by means of traditional mandamus, under Code of Civil Procedure section 1085.

Code of Civil Procedure section 1085 declares that a writ may be issued "by any court . . . to any inferior tribunal, corporation, board or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ." ██ The availability of writ relief to compel a public agency to perform an act prescribed by law has long been recognized. (See, e.g., *Berkeley Sch. Dist. v. City of Berkeley* (1956) 141 Cal.App.2d 841, 849 [297 P.2d 710] [mandamus appropriate against city auditor to compel release of fund to schools pursuant to city charter provision].)

██ What is required to obtain writ relief is a showing by a petitioner of "(1) A clear, present and usually ministerial duty on the part of the respondent . . . ; and (2) a clear, present and beneficial right in the petitioner to

the performance of that duty . . . ." (*Baldwin-Lima-Hamilton Corp.* v. *Superior Court* (1962) 208 Cal.App.2d 803, 813-814 [25 Cal.Rptr. 798], citations omitted.) ■■■ Mandamus is available to compel a public agency's performance or correct an agency's abuse of discretion whether the action being compelled or corrected can itself be characterized as "ministerial" or "legislative" Thus, we held that an ordinance passed by a city council imposing a certain salary adjustment, usually a legislative act, was an abuse of the city council's discretion because it violated a previously enacted agreement with an employee association, and was therefore subject to challenge via writ of mandate. (*Glendale City Employees' Assn., Inc.* v. *City of Glendale, supra,* 15 Cal.3d 328, 343-345.)

■■■ The MMBA, at Government Code section 3505, created a clear and present duty on the part of the County to meet and confer with the Association in good faith on the fixing of the Association members' salary and other conditions of employment, and created in Association members the corresponding beneficial right to meet and confer. (See, e.g., *Holliday* v. *City of Modesto* (1991) 229 Cal.App.3d 528, 540 [280 Cal.Rptr. 206]; *Social Services Union* v. *Board of Supervisors* (1990) 222 Cal.App.3d 279, 285 [271 Cal.Rptr. 494]; *American Federation of State etc. Employees* v. *City of Santa Clara* (1984) 160 Cal.App.3d 1006, 1009-1010 [207 Cal.Rptr. 57].) If, as the Association alleges, there has been a violation of that duty, then a writ of mandate will be available to remedy the violation.

■■■ The County cites no authority for the proposition that, once the Legislature has created a duty in a public agency, a court may limit, on public policy grounds, the availability of a writ of mandate to enforce that duty. It appears elementary that courts may not frustrate the creation of a statutory duty by refusing to enforce it through the normal judicial means. What public policy reasons there are against enforcement of a statutory duty are reasons against the creation of the duty *ab initio*, and should be addressed to the Legislature.

On the contrary, when the Legislature creates a public duty but wishes to limit the use of a writ of mandate to enforce it, it has done so affirmatively. Thus, in other public employment legislation, where the Legislature has created the Public Employment Relations Board as the principal means of enforcing the statutory duties and rights of employers and employees, it has under certain limited instances circumscribed writ relief. In these various labor relations statutes, the availability of a writ of mandate to review a Public Employment Relations Board determination of a bargaining unit's composition is limited to two circumstances: (1) instances in which the

board, upon petition, agrees that the case is one of special importance, or (2) cases in which a party raises the issue of the bargaining unit's composition as a defense to an unfair labor practice charge. (See Gov. Code, §§ 3520, subd. (a), 3542, subd. (a), 3564, subd. (a).) Thus, the Legislature knew how to circumscribe the availability of writ review, and did so for labor relations statutes that rely primarily on administrative, nonjudicial enforcement. No such administrative enforcement exists in the MMBA, and no such limitation of writ review can be found in the statute.

 The case law in this state is indeed unanimous that a writ of mandate lies for an employee association to challenge a public employer's breach of its duty under the MMBA. (See *Vernon Fire Fighters* v. *City of Vernon* (1980) 107 Cal.App.3d 802, 810 [165 Cal.Rptr. 908]; see also *San Francisco Fire Fighters Local 798* v. *Board of Supervisors* (1992) 3 Cal.App.4th 1482 [5 Cal.Rptr.2d 176]; *Social Services Union* v. *Board of Supervisors, supra,* 222 Cal.App.3d 279; *American Federation of State etc. Employees* v. *City of Santa Clara, supra,* 160 Cal.App.3d 1006; *Public Employees of Riverside County, Inc.* v. *County of Riverside* (1977) 75 Cal.App.3d 882 [142 Cal.Rptr. 521].) The County cites no contrary authority.[2]

Nor do we find persuasive the County's attempt to analogize limitations on the right to sue with limitations on the right of public employees to strike. In support of the proposition that "the extent of a public employee's enforcement rights under the MMBA depends very much on the type of work he or she performs," the County cites *City of Santa Ana* v. *Santa Ana Police Benevolent Assn.* (1989) 207 Cal.App.3d 1568 [255 Cal.Rptr. 688], in which it was held that police were prohibited from engaging in a strike or slowdown. Therefore, the County reasons, just as there are circumstances in which one traditional method of enforcing employee rights—the right to strike—may be limited, so the right to sue may be limited in some circumstances when the suit would gravely interfere with the functioning of county government.

Under closer scrutiny, however, the analogy falls apart. In *County Sanitation Dist. No. 2* v. *Los Angeles County Employees Assn.* (1985) 38 Cal.3d 564

---

[2]A petition under Code of Civil Procedure section 1085 may not be the sole judicial means available to redress MMBA violations. When an employee association seeks to challenge a city charter amendment which unilaterally alters wages or working conditions in violation of the MMBA, it has been held the exclusive remedy to challenge the Charter Amendment would be to file an action in quo warranto. (*International Assn. of Fire Fighters* v. *City of Oakland* (1985) 174 Cal.App.3d 687 [220 Cal.Rptr. 256].) Without deciding whether the result of that case is correct, we note that no case suggests that violation of a right based in the MMBA is without *some* judicial remedy.

[214 Cal.Rptr. 424, 699 P.2d 835], we abrogated the common law doctrine that prohibited public employee strikes. In doing so, we acknowledged that the MMBA was silent on the question of public employee strikes, leaving the matter "shrouded in ambiguity." (*Id.* at p. 573.) We found the traditional common law rule without basis in modern labor law, particularly in light of the MMBA and other public employment relations statutes, and in effect created a new common law rule: "[S]trikes by public employees are not unlawful at common law unless or until it is clearly demonstrated that such a strike creates a substantial and imminent threat to the health or safety of the public." (*Id.* at p. 586.) In the case of *City of Santa Ana* v. *Santa Ana Police Benevolent Assn.*, *supra*, 207 Cal.App.3d at pages 1572-1573, the court merely applied this new common law rule and found that a police strike or sickout did pose a danger to public health and safety.

The availability of the writ of mandate remedy in this case, on the other hand, is statutory, and is unambiguous. Unlike the right of public employees to strike, their right of access to courts has not been seriously questioned. As a statutory right, it is for the Legislature to delineate. There is therefore no room for a common law limitation on the right to writ relief.

We conclude that the MMBA inherently provides the Association with a right to bring a mandamus action against the County for breach of its duty to bargain in good faith, and that there are no statutory or common law grounds for limiting that right.

B. *Constitutional Separation of Powers Arguments*

The conclusion that the MMBA gives the Association the statutory right to sue does not end our inquiry. The County argues, and the Court of Appeal implicitly held, that even if the MMBA does grant the Association the right to sue, that right is nonetheless superseded by the attorney's duty of loyalty, as delineated in several Rules of Professional Conduct, and in general common law principles. The County asserts that to the extent a statute authorizes a violation of the Rules of Professional Conduct, or other professional obligation, it violates the constitutional separation of powers inherent in article VI of the California Constitution, which implicitly vests the power to govern the legal profession in the judiciary. The Association, on the other hand, claims that the Court of Appeal erred in holding the suit barred by the Attorney's duty of loyalty.

In order to assess the merit of the parties' constitutional arguments, a brief review of the separation of powers doctrine under article VI of the California Constitution is needed. ■■■ In California, "the power to regulate the

practice of law . . . has long been recognized to be among the inherent powers of the article VI courts." (*Hustedt* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 336 [178 Cal.Rptr. 801, 636 P.2d 1139].) Such power of regulation has meant that the courts are vested with the exclusive power to control the "admission, discipline and disbarment of persons entitled to practice before them . . . ." (*Brotsky* v. *State Bar* (1962) 57 Cal.2d 287, 300 [19 Cal.Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 1310].) Thus, in *Hustedt,* we held that former Labor Code section 4407, which invested in (non-article VI) workers' compensation judges the right to suspend attorneys from practicing before them, was unconstitutional because it trespassed on the powers of the judiciary inherent in article VI to regulate attorney discipline.

Other cases in which we used California Constitution, article VI separation of powers doctrine to declare a statute or a portion of it unconstitutional are few and far between. In *Merco Constr. Engineers, Inc.* v. *Municipal Court* (1978) 21 Cal.3d 724 [147 Cal.Rptr. 631, 581 P.2d 636], we held that former Code of Civil Procedure section 90, giving non-attorney representatives of corporations the right to appear in municipal court, unconstitutionally infringed on the judiciary's exclusive right to grant admission to the practice of law. In *In re Lavine* (1935) 2 Cal.2d 324, 329 [41 P.2d 161], this court held unconstitutional a statute that automatically reinstated to the bar attorneys who were convicted felons, once they received a full gubernatorial pardon. The statute encroached upon "the inherent power of this court to admit attorneys to the practice of the law and [was] tantamount to the vacating of a judicial order by legislative mandate." (*Ibid.*) These cases, as with *Hustedt* v. *Workers' Comp. Appeals Bd., supra,* 30 Cal.3d 329, entail statutes that impinge on the court's traditional power to control admission, discipline and disbarment of attorneys.

On the other hand, "this court has respected the exercise by the Legislature under the police power, of 'a reasonable degree of regulation and control over the profession and practice of law . . .' in this state." (*Hustedt* v. *Workers' Comp. Appeals Bd., supra,* 30 Cal.3d at p. 337.) ■ "The standard for assessing whether the Legislature has overstepped its authority and thereby violated the separation of powers principle has been summarized as follows. 'The legislature may put reasonable restrictions upon constitutional functions of the courts provided they do not defeat or materially impair the exercise of those functions.'" (*Id.* at p. 338, citing *Brydonjack* v. *State Bar* (1929) 208 Cal. 439, 444 [281 P. 1018, 66 A.L.R. 1507].)

■ In the field of attorney-client conduct, we recognize that the judiciary and the Legislature are in some sense partners in regulation. Side by

side with the Rules of Professional Conduct approved by this court are numerous statutes which regulate the profession and protect consumers of legal services. The State Bar Act (Bus. & Prof. Code, § 6000 et seq.) regulates various aspects of the attorney-client relationship, including contingency fee contracts (*id.*, § 6146), unlawful solicitation (*id.*, § 6150 et seq.), willful delay of client's suit with a view to the attorney's own gain (*id.*, § 6128), and purchase of a legal claim (*id.*, § 6129).

We also note that the Legislature, in enacting the MMBA, was acting well within its police powers to regulate employer-employee relations. (See generally, *Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 186 et seq. [172 Cal.Rptr. 487, 624 P.2d 1215].) The Legislature has established statutory regimes for vast numbers of employees not covered by federal labor legislation, including agricultural workers, public education employees, and state workers, as well as local government employees.

We have never held a statute of general application, which does not affect the traditional areas of attorney admission, disbarment and discipline, unconstitutional. Nonetheless, we recognize that in the field of attorney-client conduct, as in these other areas, this court has the inherent power to provide a higher standard of attorney-client conduct than the minimum standards prescribed by the Legislature. (See *Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 225 [113 Cal.Rptr. 175, 520 P.2d 991]; *In re Lavine, supra*, 2 Cal.2d at p. 328.) We also recognize that any statute which would permit an attorney to act in such a way as to seriously violate the integrity of the attorney-client relationship, so as to "materially impair" the functioning of the courts (*Hustedt* v. *Workers' Comp. Appeals Bd., supra*, 30 Cal.3d at p. 339), would be constitutionally suspect.

But a ruling that a statute affecting attorney-client relations is unconstitutional on separation of powers grounds will not be lightly made. Those raising such a claim must at least show that a direct and fundamental conflict exists between the operation of the statute in question, as it applies to attorneys, and attorneys' settled ethical obligations, as embodied in this state's Rules of Professional Conduct or some well-established common law rule. As will appear below, the County fails to make that showing in the present case.

### 1. *Violation of the Rules of Professional Conduct*

In determining whether a statute regulating attorney conduct violates the separation of powers, we begin with whether the statute in question would permit or require an attorney to contravene one of the Rules

of Professional Conduct. The County claims that a petition for a writ of mandate brought by the Association would cause the Attorneys to run afoul of rules 3-300 and 3-310 of the Rules of Professional Conduct (hereafter, all references to rules are to the Rules of Professional Conduct of the State Bar). We do not agree. As the Court of Appeal in this case conceded, neither rule is directly applicable.

Rule 3-300 does not allow an attorney to "knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client," without undergoing an extensive protocol for gaining the client's consent. The County contends that a lawsuit against the client would be tantamount to "acquiring" a "pecuniary interest" adverse to the client. The language of the rule and the intent behind it do not support that interpretation.

Rule 3-300 was intended to regulate two types of activity: business transactions between attorneys and clients and the acquisition by attorneys of pecuniary interests adverse to clients. (See State Bar, Request that the Supreme Court of Cal. Approve Amendments to the Rules of Professional Conduct of the State Bar of Cal., & Memorandum Supporting Documents in Explanation (1987) at p. 33.) Clearly, the present lawsuit is not a business transaction. Nor can we stretch the meaning of the term "acquire . . . a pecuniary interest" to encompass the filing of a petition for writ of mandate.

Although some petitions filed to enforce the MMBA could be labeled, in a certain sense, "pecuniary," in that their object is monetary gain, others have as their aim the attainment of injunctive or declaratory relief related to conditions of employment without any immediate economic payoff. (See, e.g., *Independent Union of Pub. Service Employees v. County of Sacramento* (1983) 147 Cal.App.3d 482, 487 [195 Cal.Rptr. 206].) Indeed, the very use of the word "acquire," which cannot sensibly be applied to the filing of a lawsuit or a petition for writ of mandate, demonstrates that such actions are not intended to be included within the scope of rule 3-300. As the few cases concerned with applying rule 3-300's "pecuniary interest" (as opposed to "business transaction") provision illustrate, the term "acquire a . . . pecuniary interest" is intended to signify the pursuit of some business or financial interest as conventionally understood, rather than an attempt to redress some legal wrong through the courts. (See, e.g., *Brockway v. State Bar* (1991) 53 Cal.3d 51, 63-65 [278 Cal.Rptr. 836, 806 P.2d 308] [attorney violated predecessor rule by taking ownership interest in client's property in excess of attorney fees].) Thus, the filing of the present petition is not addressed by rule 3-300.

 Nor is rule 3-310 directly implicated. Rule 3-310 proscribes attorney conflicts of interest in various contexts. The rule is concerned not merely with conflict in representation of current or former clients, but also, in rule 3-310(B), with conflicts between an attorney's own financial and personal interests and those of his or her client. The County contends that rule 3-310(B)(4), in particular, is applicable to the present case. That rule precludes attorneys from representing a client, without disclosure,[3] when "the member has or had a legal, business, financial, or professional interest in the subject matter of the representation." The County argues that the attorneys have a professional interest adverse to the County by being a part of the Association's lawsuit. We do not agree that this lawsuit falls within the scope of rule 3-310(B)(4).

The language of rule 3-310(B)(4), adopted by this court in the 1991 amendments to the Rules of Professional Conduct, applies only to conflicts that arise over "the subject matter of the representation" that the attorney undertakes for the client, and not to conflicts the attorney and client may have outside this subject matter. The primary purpose of this prophylactic rule is to prevent situations in which an attorney might compromise his or her representation of the client in order to advance the attorney's own financial or personal interests.

In this case, the lawsuit by the Association does not, in general, present a conflict with the client on matters in which the Attorneys represent the County. Stated concretely, when deputy County Counsel attorneys represent the County in a nuisance abatement action, or advise the County in a land-use matter, they will face no temptation to compromise their representation of the County in order to further their own interests. The outcome of most of the matters for which the Attorneys have undertaken representation will not affect, nor be affected by, the outcome of the Association's lawsuit. The lawsuit will not disable the Attorneys from objectively considering, recommending, or carrying out an appropriate course of action in their representation of the County. An attorney/employee may experience ill will towards the client/employer, and vice versa, as is sometimes the case when employer/

---

[3]The County is quite correct that the disclosure required by rule 3-310(B) implies the right of the client to dismiss the attorney if it finds the disclosed conflict sufficiently problematic. Thus, the Association's suggestion that its members have not violated rule 3-310(B)(4) because they have openly sued the County, and have therefore "disclosed" their conflict, is beside the point. If, in fact, the Attorneys' suit fell within the scope of the actions proscribed by rule 3-310(B)(4), they would have the duty not only to disclose, but also to resign if requested by the client, which the Attorneys failed to do in this case. Therefore, the fact that the Attorneys' suit was known to the client does not of itself absolve the Attorneys from violation of rule 3-310(B)(4).

employee relations deteriorate. Rule 3-310(B)(4), however, addresses not the existence of general antagonism between lawyer and client, but tangible conflicts between the lawyer's and client's interests in the subject matter of the representation.[4] The record below supports the trial court's implicit conclusion that no such conflict of interest is present within the meaning of rule 3-310(B)(4).[5]

Implied in the position of the County that rules 3-300 and 3-310 are violated by the Attorneys is an *a fortiori* argument. The County appears to contend that, if the duty of loyalty that an attorney owes a client requires the attorney to refrain from engaging in a business transaction with a client without informed consent, or in representing clients with conflicting interests without disclosure, then it must surely prohibit an attorney from suing a current client. This argument ignores the distinct policy considerations inherent in the different types of conflict. It is one thing to require an attorney, for the sake of client loyalty, to forgo a business opportunity or a potential client. It is another thing to require an attorney, for loyalty's sake, to forgo his or her statutory rights against a client to redress a legal injury. While such a sacrifice may indeed be required in some circumstances, that requirement is not to be found in the specific proscriptions set forth in rules 3-300 or 3-310.[6] Rather, it is to be located in a general, common law duty of

---

[4]Although there is no rule 3-310 conflict present here, if the attorney did, out of malice, or to extract concessions from the County, deliberately mishandle a matter of representation, the attorney would be subject to discipline under rule 3-110, as well as possible misdemeanor charges under Business and Professions Code section 6128. See part II.B.3 of this opinion, *post*.

[5]The County quotes the discussion of rule 3-310(B)(4), which cites, as one example of a proscribed professional interest in the subject matter of representation, "a member's membership in a professional organization which is entering into lease negotiations with the member's client." (State Bar, Request That the Supreme Court of Cal. Approve Amendments to the Rules of Professional Conduct of the State Bar of Cal., & Memorandum and Supporting Documents in Explanation (1991) at p. 15.) We understand this example to mean that the attorney would be obliged to disclose membership in a professional organization negotiating a lease with the client, if the lease negotiations in some manner related to the subject matter of his representation of the client. If the attorney represented the client in an antitrust matter, and belonged to the San Francisco Bar Association which was negotiating a lease with the client, he would be under no obligation to disclose this membership because it would not constitute a "professional interest in the *subject matter of representation*." (Rule 3-310(B)(4), italics added.) If, however, the attorney was connected with the lease negotiations, membership in the professional organization would be sufficient to require disclosure, even though the attorney may not stand to gain financially from the outcome of the negotiations.

[6]The Court of Appeal below relied for its holding in large part on rule 3-310(C). Case law has interpreted this rule, and its predecessors, to prohibit attorneys, without consent, from representing not only clients with conflicting interests in particular matters of representation, but also to prohibit attorneys from accepting employment adverse to a client even though the employment is unrelated to the representation of the current client. (See *Truck Ins. Exchange*

loyalty beyond the scope of these two rules. It is this general duty that we next consider.

### 2. *The Common Law Duty of Loyalty and the Prohibition on the Right to Sue*

Although the question of an attorney's suit against a present client is not explicitly covered in the Rules of Professional Conduct, or by any statute, arguably it may be prohibited by the general duty of loyalty recognized at common law. It is clear that the duties to which an attorney in this state are subject are not exhaustively delineated by the Rules of Professional Conduct, and that these rules are not intended to supersede common law obligations. (See rule 1-100, and accompanying discussion.)

This court's statement of the attorney's duty of loyalty to the client over 60 years ago is still generally valid: "It is . . . an attorney's duty to protect his client in every possible way, and it is a violation of that duty for him to assume a position adverse or antagonistic to his client without the latter's free and intelligent consent . . . . By virtue of this rule an attorney is precluded from assuming any relation which would prevent him from devoting his entire energies to his client's interests." (*Anderson* v. *Eaton* (1930) 211 Cal. 113, 116 [293 P. 788].) We have also decided that the duty of loyalty for an attorney in the public sector does not differ appreciably from that of the attorney's counterpart in private practice. (See *People* ex rel. *Deukmejian* v. *Brown* (1981) 29 Cal.3d 150, 157 [172 Cal.Rptr. 478, 624 P.2d 1206] [Attorney General's role as " 'guardian of the public interest' " does not exempt him from conflict of interest rules applicable to other attorneys].)

No reported appellate cases in this state have considered the extent to which an attorney's duty of loyalty to a client prohibits the attorney

v. *Fireman's Fund Ins. Co.* (1992) 6 Cal.App.4th 1050, 1056-1057 [8 Cal.Rptr.2d 228] [firm representing party A in wrongful termination action may not represent party B in unrelated suit against party A]; *Jeffry* v. *Pounds* (1977) 67 Cal.App.3d 6 [136 Cal.Rptr. 373] [firm violated predecessor rule to rule 3-310(C) by representing a client in a personal injury action, and the client's wife in a divorce action].) The rationale for these rulings was the maintenance of the attorney's "duty of undivided loyalty," without which " 'public confidence in the legal profession and the judicial process' is undermined." (*Truck Ins. Exchange* v. *Fireman's Fund Ins. Co., supra,* 6 Cal.App.4th at p. 1057.)

Yet even this interpretation of rule 3-310(C) does not make the rule apply to the present situation. A rule that an attorney must refrain from redressing a legal wrong done to him or her by a client requires a different, and greater, kind of self-abnegation than that compelled by rule 3-310(C)'s stricture that an attorney must refrain from representing a potential client for the sake of current client loyalty. Again, although the former sacrifice may be required by the general duty of loyalty to the client, it is not necessitated by rule 3-310(C).

from suing the client. It may well be that the lack of case law is due to the obviousness of the prohibition. As one court has stated: "The almost complete absence of authority governing the situation where, as in the present case, the lawyer is still representing the client whom he sues clearly indicates to us that the common understanding and the common conscience of the bar is in accord with our holding that such a suit constitutes a reprehensible breach of loyalty and a violation of the preamble to the Canons of Professional Ethics." (*Grievance Com. of Bar of Hartford County* v. *Rottner* (1964) 152 Conn. 59 [203 A.2d 82, 85].)

The attorney's duty of loyalty to the client has led the Los Angeles County Bar Association to conclude that an attorney in a fee dispute with a client must withdraw from representing a client prior to filing suit against a client. (Los Angeles County Bar Ethics Opns., opn. No. 212 (1953).) Indeed, courts in some jurisdictions have concluded that attorneys may not sue their ex-clients in some circumstances, such as for retaliatory discharge, where the lawsuit would disrupt the confidentiality of the attorney-client relationship. (See *Balla* v. *Gambro, Inc.* (1991) 145 Ill.2d 492 [164 Ill.Dec. 892, 584 N.E.2d 104, 16 A.L.R.5th 1000] [former in-house counsel may not sue for retaliatory discharge]; but see *Parker* v. *M & T Chemicals, Inc.* (1989) 236 N.J.Super. 451 [566 A.2d 215] [retaliatory discharge suit permitted].)

But we do not decide here generally the extent to which the duty of loyalty precludes an attorney's lawsuit against a current client. Rather, we seek to determine whether an attorney's lawsuit to enforce rights granted pursuant to a statutory scheme of public employer-employee bargaining is fundamentally incompatible with the essentials of the duty of loyalty. In order to answer this question, we must decide another, more fundamental, issue: to what extent is the collective bargaining relationship between an attorney/employee and a client/employer itself compatible with the attorney's duty of loyalty?

### 3. *Duty of Loyalty and Collective Bargaining*

At the heart of the conflict between attorney rights and responsibilities posed by this case is the conflict between the attorney-client relationship on the one hand, and the collective bargaining relationship between employer and (organized) employees on the other. Until relatively recently, the legal profession looked askance at attorneys joining unions or other employee associations. In 1966, the American Bar Association Committee on Ethics and Professional Responsibility (hereinafter the ABA Committee) opined that a United States government attorney could not, consistent with

ethical responsibilities, join a union. (2 ABA Informal Ethics Opns., opn. No. 917 (Jan. 25, 1966) p. 65.) As the committee explained, the attorney owes "undivided loyalty" to the government agency for which he or she works, and by becoming a member of a labor union the attorney assumes obligations "which may at times be incompatible with his obligation to his client." (*Id.* at p. 66.)[7]

One year later, however, the ABA Committee essentially reversed its position. In informal opinion No. 986, the ABA Committee acknowledged that "Generally speaking, the idea of lawyers belonging to or joining together in labor unions is basically contrary to the spirit of the Canons of Ethics" because of the conflict with the duty owed the client. (2 ABA Informal Ethics Opns., opn. No. 986 (July 3, 1967) p. 144.) However, the ABA Committee recognized that the general principle was no longer universally applicable.

"[I]t is realized that the number of lawyers who represent single employer clients, for example governmental agencies and corporations, has increased substantially in recent years and will undoubtedly continue to increase in the future. The relationship of a lawyer who is employed by a corporation or by a governmental agency to his client in terms of compensation is different from that of the lawyer who represents in his daily practice . . . a number of different clients. . . . Such lawyers have one client only, do not charge fees for their individual work and their compensation generally is not related to particular individual assignments they perform, but is rather related to the overall services which they perform. This differentiates them from those lawyers employed in a general practice of law where they perform services for a number of different clients.

"It is our opinion, therefore, that lawyers who are paid a salary and who are employed by a single client employer may join an organization limited *solely* to other lawyer employees of the same employer for the purpose of negotiating wages, hours, and working conditions with the employer client so long as the lawyer continues to perform for his employer client professional services as directed by his employer in accordance with the provisions of the Canons of Ethics. Such a lawyer would not have the right to strike, to withhold services for any reasons, to divulge confidences or engage in any other activities as a member of such a union which would violate any Canon" (2 ABA Informal Ethics Opns., opn. No. 986, *supra,* p. 45; accord,

---

[7]As stated in the Rules of Professional Conduct, ethics opinions of other jurisdictions may be consulted to determine appropriate professional conduct. (Rule 1-100(A); see also Cal. Compendium on Prof. Responsibility, pt. II, State Bar Formal Opn. No. 1983-71.)

Cal. Compendium on Prof. Responsibility, L.A. County Bar Assn. Formal Opn. No. 337 (June 14, 1973) p. 35.)

In 1975, the ABA Committee again revisited the ethical questions related to an attorney's union activities. In informal opinion No. 1325, the ABA Committee considered the propriety of strikes by attorneys who are employed by a single employer in public or private practice. The ABA Committee began by recalling its neutral position on the question of attorney membership in employee associations consisting only of attorneys. That position had since been codified in the American Bar Association's Model Code of Professional Responsibility, EC 5-13, which now states in part that "Although it is not necessarily improper for a lawyer employed by a corporation or similar entity to be a member of an organization of employees, he should be vigilant to safeguard his fidelity as a lawyer to his employer, free from outside influences."

As informal opinion No. 1325 explains, while joining an employee organization violates no specific American Bar Association disciplinary rule, there is the potential of violating several rules, such as "DR 6-101 (A)(3), proscribing neglect of a legal matter entrusted to a lawyer, DR 7-101 (A)(2), forbidding a lawyer to intentionally fail to carry out a contract for employment with a client, and DR 7-101 (A)(3), prohibiting a lawyer to intentionally prejudice or damage his client during the course of the professional relationship." (ABA Recent Ethics Opns., informal opn. No. 1325 (Mar. 31, 1975) p. 2.) The ABA Committee thereupon adopted what may be called a pragmatic approach to the question of strikes and other collective bargaining matters. If the attorney's strike leads to the neglect or intentional sabotage of the employer/client's affairs, then the attorney would have violated his or her professional obligations as embodied in the disciplinary rules cited above, and would be subject to discipline. However, "in some situations participation in a strike might be no more disruptive of the performance of legal work than taking a two week's vacation might be." (*Ibid.*)

Although we do not necessarily endorse the ABA Committee's position on the permissibility of strikes for government attorneys, we find its approach to the question of employee organization among these attorneys to be essentially correct. First, we do not find that government attorneys who organize themselves into associations pursuant to statute and who proceed to bargain collectively with their employer/clients are *per se* in violation of any duty of loyalty or any other ethical obligation. The growing phenomenon of the lawyer/employee requires a realistic accommodation between an attorney's professional obligations and the rights he or she may have as an employee.

Moreover, we follow the ABA Committee's approach to determining when an attorney, in pursuit of an employee association's goals, oversteps ethical boundaries. That occurs when the attorney violates actual disciplinary rules, most particularly rules pertaining to the attorney's duty to represent the client faithfully, competently, and confidentially. In California, those duties are found principally in Rule 3-110, which prohibits a member from "intentionally, recklessly or repeatedly fail[ing] to perform legal services with competence." An attorney, in pursuing rights of self-representation, may not use delaying tactics in handling existing litigation or other matters of representation for the purpose of gaining advantage in a dispute over salary and fringe benefits. (See Cal. Compendium on Prof. Responsibility, pt. II, State Bar Formal Opn. No. 1979-51.) Indeed, an attorney who "[w]illfully delays [a] client's suit with a view to his [or her] own gain" is guilty of a misdemeanor. (Bus. & Prof. Code, § 6128, subd. (b); see *Silver* v. *State Bar* (1974) 13 Cal.3d 134, 141 [117 Cal.Rptr. 821, 528 P.2d 1157].)

In other words, in determining whether an action taken by an attorney or employee association violates the attorney's ethical obligations, we look not to whether the action creates antagonism between the attorney/employee and the client/employer, since such antagonism in the labor relations context is unfortunately commonplace; rather, we seek to ascertain whether an attorney has permitted that antagonism to overstep the boundaries of the employer/employee bargaining relationship and has actually compromised client representation.

The County concedes that the Association and its members do have rights under the MMBA, but claims that these do not include authority to sue when their rights are violated. To fend off the argument that these collective bargaining guarantees would be meaningless without a judicial remedy, the County argues the Association has alternative effective means for enforcing the rights of its members, most notably by virtue of the fact that the attorneys have "unparalleled access" to county officials, "which they can use to [exert] pressure on the County to reach an agreement regarding wages."

Whether or not sound, that argument is beside the point. The ability of the Attorneys to influence the Board by informal means is one that predates, and exists independently of, the formal rights granted them under the MMBA. If the Attorneys are deprived of any formal means to enforce their rights, then these "rights" are no more meaningful than they were prior to the passage of the MMBA. Indeed, if the County's logic were followed, the Attorneys could be discharged for simply joining an employee association under the

MMBA, and would have no ability to sue, despite the County's clear violation of statute, and no recourse other than the informal lobbying of the Board.

Therefore, the denial of the Attorneys' right to sue for MMBA violations would represent not a compromise between collective bargaining rights and professional obligations, as the County contends, but a de facto judicial nullification of those rights. The only realistic accommodation between the enforcement of statutory guaranties under the MMBA and the enforcement of the Attorneys' professional obligations in this situation is to permit a petition for writ of mandate, as would be permitted to other public employees, while at the same time holding the Attorneys to a professional standard that ensures that their *actual* representation of their client/employer is not compromised.

We therefore hold that attorneys employed in the public sector, who exercise their statutory right to sue to enforce rights given them by the MMBA, do not in such capacity violate their ethical obligations to their employer/client.[8] In so holding, we emphasize that attorneys in such circumstances are held to the highest ethical obligations to continue to represent the client in the matters they have undertaken, and that a violation of their duty to represent the client competently or faithfully, or of any other rule of conduct, will subject those attorneys to the appropriate discipline, both by the employer and by the State Bar.[9]

In announcing this rule, we are not unmindful of the fact that attorneys suing their clients, in any circumstance, put a strain on the attorney/client

---

[8] We do not, by this holding, approve the general proposition that an attorney suit against a present client is ethically permissible. When the attorney is an independent contractor, and when no statute protects an attorney's employment rights, it may well be the case that the attorney's general duty of loyalty dictates that the attorney not sue the present client and that such a suit may subject the attorney to discipline—a question not before us here.

[9] In arguing that the Attorneys were ethically obligated to refrain from suing the County, the County cites a number of cases from other jurisdictions involving retaliatory terminations of in-house counsel. In some of these cases, the attorneys were not permitted to sue their former clients. (See *Balla* v. *Gambro, Inc., supra,* 584 N.E.2d 104; *Willy* v. *Coastal Corp.* (S.D.Tex. 1986) 647 F.Supp. 116, revd. in part on other grounds (5th Cir. 1988) 855 F.2d 1160, affd. on other grounds __ U.S. __ [117 L.Ed.2d 280, 112 S.Ct. 1076]; *Jones* v. *Flagship Intern.* (5th Cir. 1986) 793 F.2d 714, cert. den. (1987) 479 U.S. 1065 [93 L.Ed.2d 1001, 107 S.Ct. 952].) Each of these cases is readily distinguishable from the present case. *Balla* v. *Gambro* was decided, in large part, on the basis that prosecution of the lawsuit would likely make use of information obtained in confidence, and would therefore have a chilling effect on the confidential nature of the attorney-client relationship. (*Balla* v. *Gambro, Inc., supra,* 584 N.E.2d at pp. 109-110). In *Jones*, a direct conflict existed between the attorney's claim and the subject matter of her representation. (*Jones* v. *Flagship Intern., supra,* 793 F.2d at p. 728 [attorney representing corporation on Equal Employment Opportunity Commission (EEOC) matters herself brings EEOC claim].) *Willy* involved a common law retaliatory discharge

relationship, and may tend to diminish the client's confidence in their attorneys' loyalty. But we must also acknowledge, as is obvious in the record of the present case, that the hostility between an attorney/employee and the client/employer predated and to some extent gave rise to the lawsuit. The MMBA is intended not to exacerbate conflict between employers and employees, but to provide the peaceful and ordered means for resolving those conflicts by promoting "full communication between public employers and their employees." (Gov. Code, § 3500.) The Legislature may have decided that the benefits to public employee/employer relations of including attorneys within the MMBA's protections outweighed potential burdens on the attorney/client relationship. In any event, we cannot say that the Legislature, in extending these means of conflict resolution to public employee attorneys in arguably managerial roles, put such a strain on the attorney/client relationship as to compel the conclusion that the authorization of such lawsuits violates the constitutional separation of powers between the Legislature and the Judiciary.[10]

## C. *The Right of the Client to Discharge the Attorney*

Finally, we must address a point not raised explicitly by the County, but one nonetheless before us because of the nature of the relief

---

claim which the court, for public policy reasons, declined to extend to in-house counsel. (*Willy* v. *Coastal Corp., supra,* 647 F.Supp. at p. 118.)

In this case the record reveals that the contemplated writ of mandate action, concerned with the duty to meet and confer, will not lead to the revelation or use of confidential information. Nor is a *Jones* situation implicated in this case. The Attorneys represent the County in numerous areas outside the labor relations field, and the County has the flexibility to reassign counsel in the few matters where a more direct conflict exists between the attorney's subject matter of representation and the present lawsuit. (See pt. II.C. of this opinion, *post.*) Finally, the suit is brought under a statutory, not a common law theory, and this court may not limit a statutory remedy on public policy grounds (see pt. II.A.2. of this opinion, *ante*).

[10]The petition for writ of mandate that the Association contemplates filing is based on the claims that the County failed to meet and confer under the MMBA, and that it violated the prevailing wage provisions of the County Charter, section 709. These claims are interrelated. Indeed, part of its MMBA failure of good faith claim is that the County attempted to impose a wage adjustment by ignoring its own charter provision. We need not decide, therefore, whether the County's charter provision alone, without the MMBA claim, would provide the basis of a suit by the Attorneys against the County. It remains for the court below to resolve, in adjudicating the petition for writ of mandate, the extent of the County's obligation to further negotiate with the Association or its obligations to pay a certain wage under the County's charter provisions. (See, e.g., *Glendale City Employees' Assn., Inc.* v. *City of Glendale, supra,* 15 Cal.3d 328, 345 [lower court may mandate the granting of specific wage increases if public agency has already committed itself to a particular wage formula].)

requested:[11] whether the client has the right to discharge an attorney in whom it purportedly has lost faith. This question is analytically distinct from the question of attorney loyalty to the client; it considers whether, despite an attorney's actual loyalty, job performance, or observance of the Rules of Professional Conduct, a public employer should nonetheless have the right to discharge the attorney because it no longer has complete confidence in the attorney's capacity to serve loyally.

■ Code of Civil Procedure section 284 provides in part that an "attorney in an action or special proceeding may be changed at any time before or after judgment or final determination as follows: . . . (2) Upon the order of the court, upon the application of either client or attorney, after notice from one to the other." We have construed this code section to confer upon clients, beyond the context of litigation, the "[absolute] power to discharge an attorney, with or without cause . . . ." (*Fracasse* v. *Brent* (1972) 6 Cal.3d 784, 790 [100 Cal.Rptr. 385, 494 P.2d 9].) That statute embodies the recognition that " 'the interest of the client in the successful prosecution or defense of the action is superior to that of the attorney, and he has the right to employ such attorney as will in his opinion best subserve his interest.' " (*Ibid.*, quoting *Gage* v. *Atwater* (1902) 136 Cal. 170, 172 [68 P. 581].)

■ There is no question that the MMBA prohibits employers from discharging employees who exercise lawful employee rights of representation. Government Code section 3506 states that "[p]ublic agencies . . . shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502 [the public employees' right to 'form, join, and participate in the activities of employee organizations of their own choosing']." The MMBA ensures a public employee the right to "engage in a wide range of union-related activities without fear of sanction . . . ." (*Social Workers' Union, Local 535* v. *Alameda County Welfare Dept.* (1974) 11 Cal.3d 382, 388 [113 Cal.Rptr. 461, 521 P.2d 453].) Public employers may not discriminate against their employees on the basis of membership or participation in union activities.

[11]As explained on page 535 of this opinion, *ante*, the Association asked the court to enjoin the County from discharging any of its members after the filing of the petition for writ of mandate. The request was made in response to County Counsel Woodside's opinion that the Association members were required to resign before filing a petition for writ of mandate against the County. The trial court granted this injunctive relief, both preliminarily and permanently. Therefore, the question whether the County could terminate the Attorneys for participation in the lawsuit is one which was before the trial court, and is before this court. That the County did not explicitly raise that issue in its brief to this court may be due to the fact, as expressed by the County's attorney at oral argument, that it does not in fact intend to discharge the Attorneys if the Association prosecutes a suit against it. Nonetheless, the question is ripe for consideration, and is integral to the disposition of the case.

(See *Campbell Municipal Employees Assn.* v. *City of Campbell* (1982) 131 Cal.App.3d 416 [182 Cal.Rptr. 461]; *Public Employees Assn.* v. *Board of Supervisors* (1985) 167 Cal.App.3d 797, 806. 807 [213 Cal.Rptr. 491].)

This freedom from sanction obviously includes the right not to be discharged for lawful union activity. The right to participate in employee self-organization and collective bargaining would be meaningless if an employee could be discharged simply for engaging in such lawful activity. (See *Portland Williamette Co.* v. *N.L.R.B.* (9th Cir. 1976) 534 F.2d 1331, 1334 [discharge of employee engaged in union activity "inherently destructive" of union activity and therefore presumed to be discriminatory].) And as we have already concluded, in part II.A.2. of this opinion, *ante*, a suit by an employee association to enforce its rights under the MMBA is a form of lawful, protected activity. Under normal circumstances, therefore, the filing of such a suit may not lead to the discriminatory discharge or discipline of an employee. ▮▮▮ The question before us, then, is how that right to be free from discriminatory discharge for lawfully participating in activities sanctioned by the MMBA may be reconciled with the rule of Code of Civil Procedure section 284 that an attorney may be discharged by a client for any reason and for no reason.

In determining the manner in which partially conflicting statutes are to be construed, we look first to the intent of the Legislature. (*Woods* v. *Young* (1991) 53 Cal.3d 315, 323 [279 Cal.Rptr. 613, 807 P.2d 455].) As a rule, a later, more specific, statute will prevail over an earlier, more general one. (*Id.* at p. 324.) In this case, the general rule permitting a client to discharge her attorney has been modified by the subsequent explicit inclusion of certain attorneys within the scope of a statutory labor relations scheme which inherently limits the right of public employers to terminate their employees at will. We do not believe the Legislature intended to explicitly confer these rights to organize and bargain collectively on attorneys employed by cities and counties, without also intending that these attorneys be protected from discharge for pursuit of these rights.

Moreover, even if the rule of a client's right to discharge an attorney is one that predates, and has validity independent of, its enactment into statute, the legislative modification of the rule does not raise constitutional separation of powers issues.[12] The Legislature could legitimately decide that this rule—based on the principle that the client's interest in receiving satisfactory

---

[12]Indeed, in the office of county counsel itself, the Legislature has chosen for various public policy reasons to modify the usual attorney-client at will relationship, and has provided that the county counsel will serve a four-year term removable only for "good cause." (Gov. Code, § 27641.)

representation is superior to the attorney's interest in continued employment —should be altered in those limited class of cases in which the attorney is the client's employee and is discharged primarily not for providing inadequate representation as an attorney, but for the assertion of his statutory rights as an employee. The obligation of attorneys to follow the Rules of Professional Conduct and State Bar Act, as well as the client's ability to discharge an attorney for reasons other than participation in activity sanctioned by the MMBA, provides sufficient safeguards to protect the integrity of the attorney-client relationship.

We therefore hold that the MMBA creates an exception to the general rule found in Code of Civil Procedure section 284 and case law, that a client may discharge an attorney at will. That exception is a prohibition on terminating an attorney solely or chiefly because he or she has engaged in protected activity under the MMBA. As discussed in part II.A.2. of this opinion, *ante*, a suit by an employee organization to enforce such collective bargaining rights is an example of such protected activity, and may not be punished by the attorney's discipline or discharge. Attorneys who believe they have been discriminated against for protected activity may bring an antidiscrimination action in the manner available to other employees. (See *Public Employees Assn.* v. *Board of Supervisors, supra,* 167 Cal.App.3d 797, 807; *Fun Striders, Inc.* v. *N.L.R.B.* (9th Cir. 1981) 686 F.2d 659, 661-662.)

In so holding, we note here that the trial court, though deciding that an attorney cannot be discharged or disciplined for participating in the filing of this petition, declined to grant the Association's request to reinstate the Attorneys to their full employment responsibilities, e.g., to entitle them to attend confidential meetings from which they were excluded by the County Counsel once they announced their intention to sue. The trial court decided this matter correctly. Although the County may not punish the Attorneys for suit over an MMBA matter, there is no reason why the County should not be accorded great flexibility in reorganizing the County Counsel's office to respond to the lawsuit. This may include, as the trial court below suggested, the reassignment of Association members to matters of representation outside the field of labor relations. Nothing in the MMBA prohibits the Board and its members from asserting their rights, as clients, to refuse representation from the Association attorneys on any given matter, and to make use of non-Association attorneys or outside counsel in sensitive matters, so long as such reassignment is done nonpunitively. By allowing the County this flexibility, the trial court properly balanced the County's need for obtaining representation in which it has full confidence with the Attorneys' statutory employment rights.

### III. *Disposition*

The judgment of the Court of Appeal is reversed, with directions to affirm the judgment of the trial court.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

**PANELLI, J.,*** Dissenting.—The majority concludes that, at least in this case, an attorney's interest in suing a present client takes precedence over the client's right to discharge an attorney who no longer enjoys the client's full trust and confidence. I do not agree.

My primary objection is not to the majority's interpretation of statutes and disciplinary rules but, rather, to its failure to see the problem from the client's perspective. This failure is evident in the majority's belief that there can be "general antagonism between lawyer and client" due to litigation between them without "actually compromis[ing] client representation." (Maj. opn., *ante*, at pp. 547, 552.) Experienced attorneys may have no difficulty meeting as friends after facing each other as adversaries in court. But the same is not to be expected of clients, who justifiably feel that they are entitled to their advocates' unquestioned loyalty. "When a client engages the services of a lawyer in a given piece of business he is entitled to feel that, until that business is finally disposed of in some manner, he has the undivided loyalty of the one upon whom he looks as his advocate and his champion. If, as in this case, he is sued . . . by his own attorney, who is representing him in another matter, all feeling of loyalty is necessarily destroyed, and the profession is exposed to the charge that it is interested only in money." (*Grievance Com. of Bar of Hartford County* v. *Rottner* (1964) 152 Conn. 59 [203 A.2d 82, 84].)

Because clients do expect loyalty, I find no reason to doubt the sincerity of the members of the board of supervisors who testified that being sued by their own attorneys has "greatly affected" their "level of trust and confidence" in the latter. The majority, I submit, tacitly concedes that the supervisors' fears are reasonable by holding that the supervisors, "to respond to the lawsuit," may reorganize the county counsel's office and reassign members of the Association to matters outside the field of labor relations. (Maj. opn., *ante*, p. 557.) What is the point of such a reorganization unless the supervisors have actually lost confidence in their attorneys' ability to represent the county effectively, at least in the area of labor relations, on

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

account of their attorneys' decision to accuse the county in open court of violating the labor relations laws?

The majority, in concluding that these attorneys may sue their clients, places far too much weight on the absence of a specific disciplinary rule to the contrary. If anything can be inferred from the absence of such a rule it is not that this court, or the bar, implicitly endorses such conduct. Instead, the more reasonable inference is that in most cases no rule is necessary. From my experience, any lawyer in private practice so bold as to sue his client can expect to be fired on the spot. As one court put it, "[t]he almost complete absence of authority governing the situation . . . indicates to us that the common understanding and the common conscience of the bar is in accord with [the view] that such a suit constitutes a reprehensible breach of loyalty . . . ." (*Grievance Com. of Bar of Hartford County* v. *Rottner, supra,* 152 Conn. 59 [203 A.2d at p. 85].)

In the rare cases in which an attorney has become the client's adversary in litigation, the resulting appearance of impropriety has been found too serious to countenance. Thus, we have enjoined the Attorney General from suing the Governor, his client, on the ground that he was bound by the same ethical principles that prevent other attorneys from representing adverse interests. (*People* ex rel. *Deukmejian* v. *Brown* (1981) 29 Cal.3d 150, 155-160 [172 Cal.Rptr. 478, 624 P.2d 1206].) Similarly, other courts have held that a criminal defendant who was sued by his attorney for fees while in jail awaiting sentencing was entitled to have his conviction reversed on account of ineffective assistance without proving that the lawsuit actually affected his counsel's performance (*Clark* v. *State* (1992) 108 Nev. 324 [831 P.2d 1374, 1377]), and that an in-house attorney who represented a corporation on employment matters was properly terminated for filing a discrimination suit against the corporation (*Jones* v. *Flagship Intern.* (5th Cir. 1986) 793 F.2d 714, 726, cert. den. (1987) 479 U.S. 1065 [93 L.Ed.2d 1001, 107 S.Ct. 952]).

The county's brief nicely illustrates how the appearance of impropriety arises in such cases and why it is so serious: "the County will be greatly disadvantaged in defending itself against the Association's proposed lawsuit. The Association members have been privy to the most confidential internal communications within the County government for years. As plaintiffs, they will have an awareness of their defendants' strategies, resources and legal opinions that would be protected from any other plaintiff by the attorney-client privilege. This insider's familiarity will give the Association an invaluable advantage in making legal argument, but particularly in pursuing settlement. The County will be put in the untenable position of having to rely on outside counsel that knows less about the Supervisors and the inner workings of the County client than does the party suing it."

In this way, when governmental and other in-house lawyers sue their clients, the former relationship of trust and confidence becomes an unfair tactical and informational advantage that the client may well view as a serious betrayal. This, in my view, is something that this court should prevent and has the power to prevent. We have always accepted the ultimate responsibility of regulating the practice of law and claimed the prerogative of doing so as one of "the inherent powers of the article VI courts." (*Hustedt* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 336 & fn. 5 [178 Cal.Rptr. 801, 636 P.2d 1139]; see also *The People* v. *Turner* (1850) 1 Cal. 143, 150.) Indeed, we have held to be unconstitutional statutes that purported to usurp that prerogative. (*Hustedt* v. *Workers' Comp. Appeals Bd., supra*, 30 Cal.3d at p. 336; *Merco Constr. Engineers, Inc.* v. *Municipal Court* (1978) 21 Cal.3d 724, 728-729 [147 Cal.Rptr. 631, 581 P.2d 636]; *In re Lavine* (1935) 2 Cal.2d 324, 329 [41 P.2d 161].)

It is unfortunate that today the majority takes a step backwards by concluding that the general statute authorizing courts to issue the writ of mandamus (Code Civ. Proc., § 1085) somehow supersedes our inherent power to regulate the bar, unlike the other statutes that have come into conflict with that power. The majority asserts that the petition for mandate, "[a]s a statutory right, . . . is for the Legislature to delineate" and that "[t]here is therefore no room for a common law limitation on the right to writ relief." (Maj. opn., *ante*, at p. 542.) But the majority's reasoning is faulty. This court's power to regulate the practice of law is grounded in article VI of the state Constitution rather than the common law. (*Hustedt* v. *Workers' Comp. Appeals Bd., supra*, 30 Cal.3d at p. 336 & fn. 5.) When the Constitution conflicts with a statute, the former must control.

Finally, I doubt whether the majority's holding will be good for governmental and other in-house attorneys. In recent years the status of in-house attorneys has improved as governments and businesses have increasingly relied upon them in their drive to save legal costs. This is good for society, because attorneys with intimate knowledge of and constant access to their clients are in an excellent position to advise responsible behavior and compliance with the law. However, in-house attorneys enjoy this trust and confidence in large measure because they have been held to the same high ethical standards as all other attorneys. If, through decisions such as this, the perception arises that in-house attorneys are not being held to the same ethical standards, their professional standing and usefulness to their clients and society will diminish to the detriment of attorney and client alike.

I would affirm the judgment of the Court of Appeal.

Respondent's petition for a rehearing was denied May 19, 1994.