Filed 4/28/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CECILIA OCHOA et al., | |
| Plaintiffs and Respondents, | G052409 |
| v. | (Super. Ct. No. 30-2015-00782615) |
| ANAHEIM CITY SCHOOL DISTRICT et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, Andrew P. Banks, Judge.  Affirmed.  Plaintiffs' request for judicial notice.  Granted.  Defendants' requests for judicial notice.  Granted.  Amicus Curiae California School Boards Association's Education Legal Alliance's request for judicial notice.  Denied.

Fagen Friedman & Fulfrost, Kimberly A. Smith, Cynthia M. Smith, Stephanie Baril, James K. Ayden and David Mishook for Defendants and Appellants.

Lozano Smith, Edward J. Sklar, Sloan R. Simmons, Frances M. Valdez; and Keith J. Bray for California School Boards Association's Education Legal Alliance as Amicus Curiae on behalf of Defendants and Appellants.

Laura P. Juran and Michael D. Hersh for California Teachers Association as Amicus Curiae on behalf of Defendants and Appellants.

Kirkland & Ellis, Mark Holscher, Beth M. Weinstein and Daniel A. Bress for Plaintiffs and Respondents.

Young, Minney & Corr, Paul C. Minney, Kevin M. Troy, Michelle A. Lopez; Ricardo Soto, Julie Ashby Umansky and Phillipa L. Altman for California Charter Schools Association as Amicus Curiae for Plaintiffs and Respondents.

Gibson, Dunn & Crutcher, Joshua S. Lipshutz, Ryan P. McGinley-Stempel, Robert E. Dunn and Julia L. Reese for Professor John E. Coons, Professor Stephen D. Sugarman, Professor G. Marcus Cole and Students Matter as Amici Curiae on behalf of Plaintiffs and Respondents.

Joshua P. Thompson and Caleb R. Trotter for Pacific Legal Foundation and Parent Revolution as Amici Curiae on behalf of Plaintiffs and Respondents.

\* \* \*

## INTRODUCTION

The federal No Child Left Behind Act of 2001 mandated that states establish accountability systems, requiring that all schools make "adequate yearly progress" (AYP).  (Pub.L. No. 107-110 (Jan. 8, 2002) 115 Stat. 1425.)  California later enacted the Parent Empowerment Act of 2010 (Ed. Code, §§ 53300-53303) (the Act) which allows parents of children in poor-performing schools to trigger a change in the governance of those schools.

Under the Act, if a school in California continues to fail in meeting certain benchmarks, including the requirement that it meet AYP as defined by federal law, parents may trigger a process to implement one of the four intervention plans at the school.  The process includes the submission of a petition signed by the parents of at least one-half of the school's pupils, which satisfies criteria set forth in the regulations promulgated under the Act (see Cal. Code Regs., tit. 5, §§ 4800-4804[1]).

---

[1]  All further references to "Regulations" are to title 5 of the California Code of Regulations.

2

In early 2015, parents of students enrolled at Palm Lane Elementary School in Anaheim submitted such a petition under the Act to the Anaheim City School District (the trigger petition). The trigger petition sought implementation of the "restart model" (Ed. Code, § 53202, subd. (a)(2)) intervention plan. The restart model option involves the transfer of control over the school in question from the school district to a charter school operator. (Ed. Code, §§ 53202, subd. (a)(2), 53300.) The Anaheim City School District rejected the trigger petition on the ground it failed to meet certain criteria set forth in the applicable Regulations.

Palm Lane Elementary School parents Cecilia Ochoa, Magdalena Paredes, Marlene Gaytan, Mayra Cervantes, and Geronimo Gaytan, along with California Center for Parent Empowerment (collectively, the Petitioners), filed a petition for a writ of mandate against Anaheim City School District and Anaheim City School District Board of Education (together, the District). The petition sought the issuance of a writ commanding the District to accept the trigger petition or provide legally sufficient reasons for rejecting it. Following a six-day bench trial, the court found the District's reasons for rejecting the trigger petition invalid and granted the petition for a writ of mandate.

We affirm and hold:

1. At the time the trigger petition was submitted, Palm Lane Elementary School qualified as a subject school to which the Act applied. The Act applied notwithstanding the fact California obtained a waiver from the United States Department of Education, exempting California from calculating AYP for elementary and middle schools during the 2013-2014 school year. The one-year waiver was sought by the State Board of Education to enable a year of field testing of a new standardized testing system that would replace the tests upon which AYP's had been previously based. The one-year waiver from testing and the lack of a 2014 AYP report do not constitute a tacit repeal of the Act or otherwise preclude the parents from seeking relief under the Act.

3

2. Substantial evidence supported the findings that the trigger petition (a) identified lead petitioners and provided their contact information, (b) contained the regulatory language of Regulations section 4804, describing the restart model, and (c) contained the signatures of parents of one-half of the pupils of Palm Lane Elementary School.

3. Insufficient evidence showed that the entity called Ed Reform Now constituted an agency or organization that supported the trigger petition through direct financial assistance or in-kind contributions of staff and volunteers, so as to require that its name appear on the front page of the trigger petition within the meaning of Regulations section 4802, subdivision (a)(1) and (10).

4. The Petitioners exhausted their administrative remedies by submitting the trigger petition to the District in January 2015; they were not required to resubmit a revised petition to the District before seeking writ relief.

As we explained in oral argument, the legal issues in this case are as summarized above and as analyzed in detail in our opinion. We are not opining on whether public schools or charter schools are better for the education of children.


FACTS

I.

PARENTS OF STUDENTS AT PALM LANE ELEMENTARY SCHOOL DECIDE TO CIRCULATE THE TRIGGER PETITION TO IMPLEMENT THE RESTART MODEL AND TRANSFER CONTROL OF THE SCHOOL TO A CHARTER SCHOOL ORGANIZATION.

A group of parents of Palm Lane Elementary School students, which called itself "Padres de Palm Lane Elementary United," began meeting over concerns about the quality of the education provided at the school. The group invited former California State Senator Gloria Romero, who authored the Act, to attend a meeting in a park and explain that law. At a second meeting, Romero brought information and fliers about the

4

Act.  At a third meeting, the parents decided to pursue seeking the charter school option available through the Act and the trigger petition was prepared to begin collecting signatures.

In June 2014, Palm Lane Elementary School parents began signing the trigger petition.  The meetings continued to be held in the park with Romero; the Act was explained to new parents who attended and the trigger petition was signed by them.

II.

THE PARENTS COLLECT SIGNATURES.

Alfonso Flores, a consultant on educational organization issues and who had previously worked with Romero on other trigger petition campaigns in California, heard about the trigger petition campaign involving Palm Lane Elementary School and learned that Romero's nonprofit organization, California Center for Parent Empowerment, was involved.  He contacted Romero to find out if he could become involved and was given the responsibility of running the trigger petition campaign.

By the time Flores joined the campaign, 18 percent of the needed parent signatures had been collected.  In August 2014, Flores trained parents how to present the trigger petition and collect signatures by going door to door.  He taught them to show the parents, with whom they spoke, the trigger petition packet page by page.  They were trained to never obtain a parent's signature without first going through the entire petition packet with him or her.

There were two sets of the trigger petition packet—one was written in English and the other in Spanish.  The trigger petition packets each contained a separate piece of paper setting forth the restart model language required by regulation and information regarding "myths" about charter schools.  The packets also included a cover letter explaining the "story of Palm Lane" and why parents were pursuing the trigger

5

petition and what their potential signatures meant.  During door-to-door presentations, the signature collectors would keep the signed copy of the trigger petition and leave a copy of the entire packet with the parent.  The parents who gathered signatures worked in groups of three and were accompanied by Flores or members of his team.  The door-to-door phase of the trigger petition campaign began in September 2014.

Flores personally checked the trigger petition packets to make sure they were complete before they were taken by parents to gather signatures.  He personally verified that the trigger petition that had been signed before he had become involved in the campaign included the requisite regulatory language describing the restart model.

Flores testified that he was paid $60,000 for his work on the trigger petition campaign.  He was paid by a nonprofit organization based in New York called Ed Reform Now to which California Center for Parent Empowerment belongs.

III.

PALM LANE ELEMENTARY SCHOOL PARENTS ARE INFORMED THEIR SCHOOL AGAIN FAILED TO ACHIEVE AYP STANDARDS IN 2012-2013.

In October 2014, the superintendent of the Anaheim City School District, Linda Wagner, sent a letter to the parents and legal guardians of the Palm Lane Elementary School students, stating:  "The purpose of this letter is to inform you that Palm Lane Elementary School continues to be identified as a year 5 Program Improvement (PI) school under the federal *No Child Left Behind Act of 2001 (NCLB).*"  The letter explained that the No Child Left Behind Act of 2001 "requires the state and district to review annually the progress of federally funded Title I schools and to identify schools in need of improvement.  These schools are identified as Program Improvement (PI) schools after two consecutive years of not making Adequate Yearly Progress (AYP)."  The letter explained that the reason Palm Lane Elementary School continued in program improvement was because it did not achieve AYP in 2012-2013, and,

6

specifically, the school "failed to meet the English-language arts and Mathematics proficiency targets for the Schoolwide, Hispanic, Socioeconomically Disadvantaged and English learner student groups."

The letter identified possible options, described in the letter as follows: "The Parent Empowerment Act enables parents and legal guardians who are dissatisfied with their children's struggling schools to voice their discontent and overhaul the structure and operations of their schools. The law creates a process which allows parents of students in low-performing schools to sign a petition to implement one of the intervention models—replacing all or some of the staff, turning the school over to a charter operator, transforming it through some programs, or closing the school altogether."

Magdalena Paredes received Wagner's letter and was happy that the parents had already gathered a number of signatures. She resolved to continue to do so.


IV.

THE TRIGGER PETITION IS FINALIZED AND PRESENTED TO THE DISTRICT.

For months, the parents collected signatures for the trigger petition. When the parents were close to obtaining their goal number of signatures, Flores told them he needed five parents who would serve as leaders (the lead petitioners) and represent the other parents when the trigger petition was turned in to the District. Paredes volunteered to be one of the lead petitioners who would physically turn in the trigger petition to and be a contact person with the District. Four other parents also agreed to serve as the lead petitioners.

On January 14, 2015, the parents had an appointment to submit the trigger petition to the District. Flores's team prepared the sheet identifying the lead petitioners, and the trigger petition submission was placed in a three-ring binder; the lead petitioners sheet was the first page inside the binder. Flores and his team checked the binder on the

7

night before and on the morning of the submission to the District. A group of parents, including Paredes, first met with Flores in the park. Flores handed Paredes the trigger petition submission to be delivered to the District.

Paredes testified that the trigger petition submission was contained in a three-ring binder and that she saw the first page inside the binder contained the following information:

"Padres de Palm Lane Elementary United

"Petition Campaign at Palm Lane Elementary

"Anaheim City School District

"Parent Empowerment Act—RESTART MODEL

"332 Petitions

"490 Students

"Representing 66% of enrolled students

"Submitted January 14th, 2015

"to Anaheim City School District

"Petitions Gatherers: [followed by a table containing the names, addresses, and telephone numbers of five parents, including Paredes]." (Boldface omitted.)

Paredes closed the binder and took it to the District's office. The receptionist instructed Paredes and those who accompanied her to leave the binder. Flores kept his eye on the binder before it was submitted to the District and witnessed it being handed to the receptionist; he never saw the binder fall or slip out of anyone's hands. The parents signed the visitors logbook/notebook at the District's office.

V.

ROMERO CONTACTS WAGNER.

In a letter to Wagner, dated February 12, 2015, Romero stated that on January 14, 2015, parents at Palm Lane Elementary School had submitted the trigger

8

petition and further stated the District had 40 days from the date of submission to verify the signatures on the trigger petition and that the District had not yet publicly shared the status of the verification process. Romero stated several parents had reported that they had received telephone calls from individuals who refused to identify themselves but stated they were employees of the District and asked if the parents had signed the trigger petition. When the parents answered in the affirmative, the unidentified callers would state that their signatures did not "match" the signatures contained in the school's records.

Romero wrote: "Even if you are personally opposed to enforcement of the Parent Trigger law, I am sure you do not wish for these parents and their children to suffer unnecessarily. Obviously, your callers should stop making statements that sound like the parents are accused of wrongdoing, and the callers should identify themselves. But even if you believe that names of callers need to be private and there are legitimate reasons to tell the petition[er] that his or her signature does not 'match' his record signature (if it doesn't), there is a simple way to make the calls less intimidating for parents. The five parents identified as lead petitioners stand ready to help. They are willing to assist your callers by participating in the calls, a role expressly contemplated by the regulations. Many of the parents who signed the petition already know and trust them. A familiar name and a familiar voice can ease the tension that has been happening in the recent calls. If you are having any difficulty reaching the lead petitioners, I would be happy to coordinate the times when the lead petitioners are able to assist."

VI.

THE DISTRICT REJECTS THE TRIGGER PETITION.

On February 19, 2015, the District rejected the trigger petition. The District's written "Board Findings And Action Regarding Parent Empowerment Petition"

9

(the findings) acknowledged the District's receipt of the trigger petition, containing signatures of parents on behalf of "488 purported Palm Lane Elementary School students," but stated the trigger petition was rejected based on the findings: (1) Palm Lane Elementary School was not a subject school under the Act because it "has not 'failed' to make adequate yearly progress" on the ground there was no 2014 AYP determination by the State Department of Education; (2) the petitioners failed to submit a separate document identifying the lead petitioners; (3) the trigger petition did not contain a description of the restart model; and (4) the trigger petition did not meet the parent signature requirement representing one-half of the school's students.

The findings noted the District had also considered whether "gifts, rewards, or tangible incentives" had been offered to secure signatures and whether signature gatherers had made false statements or promises. The District concluded there was "insufficient evidence at this juncture to make a finding on this issue and such allegations are not a factor in the Board's Findings regarding the Petition's validity." Flores testified that those allegations of misconduct by signature gatherers were false.

The findings concluded with the following statement under the heading "Action" (italics & underscoring omitted): "[T]he Petition is materially non-qualifying and is rejected as insufficient." At the Anaheim City School District Board of Education meeting on February 19, the president of the District verbally advised that the trigger petition could be resubmitted in 60 days.

Flores testified he had not been informed before February 19 of the District's assertion that it had not received the document identifying the lead petitioners. Another copy of that document was submitted to the District.

PROCEDURAL HISTORY

In April 2015, the Anaheim City School District filed a complaint, which is not in the record but, according to the District's opening brief, sought a judicial

10

determination regarding whether Palm Lane Elementary School was a "subject school" under the Act, given that no AYP determination had been made for any elementary or middle school in the state for 2014. In response to the Anaheim City School District's complaint, the Petitioners filed a cross-complaint (which is also not in the record) and a verified petition for a writ of mandate against the District (which is). Neither the Anaheim City School District's complaint nor the Petitioners' cross-complaint is at issue in this appeal.

The verified petition for a writ of mandate, brought under section 1085 of the Code of Civil Procedure, sought a writ of mandate requiring the District to set aside its rejection of the trigger petition and grant the trigger petition to transform Palm Lane Elementary School into a charter school or, alternatively, requiring the District to provide "a legally-sufficient basis for rejecting Petitioners' Petition."

In July 2015, after a six-day bench trial, the court issued its decision and order finding that the District wrongfully rejected the trigger petition as to Palm Lane Elementary School, which the court found was a subject school under the Act. In its decision and order, the court expressly rejected the District's arguments that the trigger petition was defective on the grounds (1) the parents had failed to submit a separate document that identified the lead petitioners at the time the trigger petition was submitted; (2) the trigger petition failed to contain language of Regulations section 4804, describing the restart model; and (3) the trigger petition did not contain signatures of parents representing at least one-half of the students of the school.

The trial court thereafter issued a writ of mandate, commanding the District to "1) Within 20 calendar days of the date below, rescind the February 19, 2015 action of the Anaheim City School District Board of Education that rejected the Parent Trigger Petition; and [¶] 2) Within the same 20 calendar days, accept the Parent Trigger Petition submitted on January 14, 2015; and [¶] 3) Allow Petitioners to immediately begin the process of soliciting and selecting charter school proposals."

11

The District appealed.  The District filed a return to the trial court's writ of mandate, in accordance with section 1108 of the Code of Civil Procedure, advising the court and the Petitioners that the District had not taken the action commanded by the writ due to the filing of a notice of appeal.

In September 2015, judgment was entered in favor of the Petitioners and against the District, awarding the Petitioners prevailing party costs under section 1032 of the Code of Civil Procedure.

## REQUESTS FOR JUDICIAL NOTICE

### I.

WE GRANT THE DISTRICT'S SECOND REQUEST FOR JUDICIAL NOTICE.[2]

Pursuant to rule 8.54 of the California Rules of Court and Evidence Code sections 451, 452, and 459, the District has requested that this court take judicial notice of (1) the State Department of Education's 2015 AYP school report for Palm Lane Elementary School; and (2) the Every Student Succeeds Act (Pub.L. No. 114-95 (Dec. 10, 2015) 129 Stat. 1802).  We grant the District's second request for judicial notice.

### II.

WE GRANT THE DISTRICT'S THIRD REQUEST FOR JUDICIAL NOTICE.

Pursuant to rule 8.54 of the California Rules of Court and Evidence Code sections 451, 452, and 459, the District has requested that this court take judicial notice of (1) the State Board of Education's May 2016 agenda item No. 06; (2) the State Board of Education's final minutes, May 11-12, 2016; and (3) the State Department of Education's

---

[2] The District's first request for judicial notice was previously denied by this court.

Every Student Succeeds Act, 2016-2017 school year transition plan.  We grant the District's third request for judicial notice.

### III.

### WE GRANT THE PETITIONERS' REQUEST FOR JUDICIAL NOTICE.

Citing rules 8.54 and 8.252 of the California Rules of Court and Evidence Code sections 452, subdivision (c) and 459, subdivision (a), the Petitioners have filed a request that this court take judicial notice of (1) the State Board of Education's "Final Statement of Reasons" for adoption of the Act's regulations and (2) "the Final Minutes for the September 7-8, 2011, Meeting of the State Board of Education adopting that statement."  The District has not filed an opposition to this request.  We grant the Petitioners' request for judicial notice.

### IV.

### AMICUS CURIAE CALIFORNIA SCHOOL BOARDS ASSOCIATION'S EDUCATION LEGAL ALLIANCE'S REQUEST FOR JUDICIAL NOTICE IS DENIED.

Amicus curiae California School Boards Association's Education Legal Alliance (CSBA) has filed a request that this court take judicial notice of "several publically accessible records and documents probative to the Court's consideration of this appeal."  Specifically, "CSBA requests judicial notice of several information guides, general background information, guidance, and a workbook regarding the use [of] AYP in the past and presently by CDE [(California Department of Education)] (Exhibits A, B, C, D, and H); data and information regarding specific schools and school district performance (Exhibits E and I); United States Congressional history, conference reports, and hearings regarding the abandonment of AYP on a federal level (Exhibits M, O, P, Q, and R); California legislative history regarding AYP and implementation of NCLB [(No Child Left Behind Act of 2001)] at a state level (Exhibit F); California Assembly Bill

13

revising certain metrics prescribed by NCLB, but not AYP (Exhibit S); as well as articles and reports regarding the impact on AYP in California and how California's standards compare to standards established in other states (Exhibits G, J, K, L, and N)."

CSBA generally argues: "The documents, records, reports and legislative history listed above are relevant and are of substantial consequence to the determination of issues presented before this Court, as well as CSBA's *Amicus Curiae* Brief. The materials provide the Court with valuable information regarding the history, framework, and current condition of AYP as a discarded metric of student proficiency and school accountability both nationally and in California. Other of these materials provide the Court with valuable information regarding how AYP worked in practice and its detrimental impact on public schools, especially in California."

Even assuming that all of the documents, which CSBA identifies, might be proper subjects of judicial notice under the Evidence Code, CSBA has failed to explain how those documents are relevant to the determination of the very specific issues raised in this appeal. It is undisputed that there is no 2014 AYP report because of the one-year waiver provided to California by the United States Department of Education.

CSBA has failed to explain how additional information, not already in the record, regarding AYP in the form of a workbook regarding school accountability, an information guide on a 2013 AYP report, an information guide on a 2015 AYP report, frequently asked questions about the 2015 accountability, Palm Lane Elementary School's 2015 AYP school report based on criteria then employed, etc., would be helpful to the resolution of the issues in this case. We therefore deny CSBA's request for judicial notice. (See *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1089, fn. 4 [denying request where the materials sought to be judicially noticed were not particularly supportive of the respondent's cause or relevant to the action and noting that "[n]o party has alleged" what the amicus curiae had purported to respond to].)

14

DISCUSSION

I.

GENERAL LEGAL PRINCIPLES GOVERNING WRITS OF MANDATE
AND THE APPLICABLE STANDARDS OF REVIEW

A writ of mandate will issue to "compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station" (Code Civ. Proc., § 1085, subd. (a)), "where there is not a plain, speedy, and adequate remedy, in the ordinary course of law" (Code Civ. Proc., § 1086). The writ will issue against a county, city, or other public body, or against a public officer. (*Housing Authority v. City of L. A.* (1952) 38 Cal.2d 853, 869-871; *County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 653.)

"'A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by such inferior tribunal, corporation, board, or person.' (Code Civ. Proc., § 1085, subd. (a).) 'What is required to obtain writ relief is a showing by a petitioner of "(1) A clear, present and usually ministerial duty on the part of the respondent . . . ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty . . . ."' (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 539-540 . . . .) [¶] 'The availability of writ relief to compel a public agency to perform an act prescribed by law has long been recognized.'" (*Norton v. San Bernardino City Unified School Dist.* (2008) 158 Cal.App.4th 749, 756-757, fn. omitted.)[3]

---

[3] "A writ cannot be used to control a matter of discretion. [Citation.] Where a statute leaves room for discretion, a challenger must show the official acted arbitrarily, beyond the bounds of reason or in derogation of the applicable legal standards." (*Excelsior College v. Board of Registered Nursing* (2006) 136 Cal.App.4th 1218, 1238-1239.)

"In reviewing the trial court's ruling on a writ of mandate, the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence.  This limitation, however, does not apply to resolution of questions of law where the facts are undisputed.  In such cases, as in other instances involving matters of law, the appellate court is not bound by the trial court's decision, but may make its own determination.  Statutory construction is such a question of law for the courts."  (*Tarbet v. East Bay Municipal Utility Dist.* (2015) 236 Cal.App.4th 348, 354.)

A hearing on a petition for writ of mandamus constitutes a "trial of a question of fact" within the meaning of section 632 of the Code of Civil Procedure and therefore requires a statement of decision upon a timely request.  (*Giuffre v. Sparks* (1999) 76 Cal.App.4th 1322, 1326 & fn. 3; see *Mellinger v. Municipal Court* (1968) 265 Cal.App.2d 843, 847.)

## II.

### PALM LANE ELEMENTARY SCHOOL IS A SUBJECT SCHOOL UNDER THE ACT NOTWITHSTANDING THE ABSENCE OF A 2014 AYP DETERMINATION.

The District argues that the Act did not apply to Palm Lane Elementary School at the time the trigger petition was submitted to the District because the school failed to meet all of the criteria of a "subject school" under the Act (Regs., § 4800.1, subd. (k)(1)).  A subject school is a school that is identified by the State Superintendent of Public Instruction, following the release of the annual AYP report, which "(1) Is not one of the persistently lowest-achieving schools identified by State Superintendent of Public Instruction (SSPI) and the State Board of Education (SBE); [¶] (2) Has been in corrective action pursuant to paragraph (7) of Section 1116(b) of the federal Elementary and Secondary Education Act for at least one full academic year; [¶] (3) Has failed to make adequate yearly progress (AYP); and [¶] (4) Has an Academic Performance Index

(API) score of less than 800.  [¶] (5) Has not exited Program Improvement."  (Regs., § 4800.1, subd. (k).)

The District's argument that Palm Lane Elementary School was not a subject school is based on only one criterion which, it claims, was not satisfied—that the school failed to make AYP in 2014.  In the opening brief, the District explains:  "AYP is determined through multiple factors, one of which is students' performance on specific state administered standardized tests. . . . In the 2013-2014 school year, California eliminated the Standardized Testing and Report ('STAR') program and replaced it with the California Assessment of Student Performance and Progress ('CAASSP') program, also known as the Measurement of Academic Performance and Progress ('MAPP'), through amendments to Education Code section 60604. . . . [¶] These same amendments suspended STAR testing, and provided for field tests only of the new MAPP test.  In doing so, the amendments made clear that for 2013-2014, the field test results *could not be used for the calculation of any accountability measure*.  [Citation.]"  The record shows that on March 7, 2014, the United States Department of Education approved California's request for a one-year testing and AYP reporting waiver; consequently, no elementary or middle school in California received AYP reports for the 2013-2014 school year.

In April 2014, Tom Torlakson, the State Superintendent of Public Instruction, sent a letter to county and district superintendents and charter school administrators, informing them of California's one-year testing waiver which, he stated, would allow for flexibility in making AYP determinations for schools participating in the Smarter Balanced assessment test.  He stated that no 2014 AYP report would be produced by the State Department of Education for elementary and middle schools and elementary and unified school districts.  He further stated, "the Program Improvement (PI) status for these schools and districts will not change.  Schools will not enter or exit PI.  However, schools will continue to implement the PI requirements associated with their current PI status.  (PI Year 1 must continue to offer school choice, e.g.)."

17

The trial court concluded Palm Lane Elementary School was a subject school under the Act, notwithstanding the absence of a 2014 AYP report, because "[t]he reliance of the Respondents upon Exhibit 47 and the determination by State Superintendent of Public Instruction, the Honorable Tom Torlakson, that no 2014 AYP report for elementary and other schools would be prepared by the California Department of Education did not provide a safe harbor against parents utilizing the Act as the Respondents argue. Instead, it froze those schools and districts in their status based on prior measured AYP results. The evidence clearly establishes that Palm Lane failed to make adequate yearly progress."

Torlakson's letter supported the trial court's conclusion that the State Department of Education's procurement of a waiver from testing and preparation of a 2014 AYP report was for the purpose of enabling it to conduct field testing of a new standardized testing scheme without penalty. Nothing in Torlakson's letter suggested that the one-year waiver rendered the Act unenforceable or, in effect, repealed. Torlakson's letter clarified that the schools would maintain their program improvement statuses and must continue to implement the program improvement requirements associated with those statuses. In other words, Torlakson directed that the schools were to continue in the same statuses they had before the waiver year with regard to program improvement issues. It logically follows that the schools, which were subject to the Act up to the AYP waiver year, remained subject schools, notwithstanding the absence of a 2014 AYP report.

Palm Lane Elementary School failed to meet AYP for nine of the prior 10 years, and the school specifically failed to meet AYP pursuant to the 2013 report. Thus, the trial court properly concluded that, given its history, Palm Lane Elementary School qualified as a subject school under the Act for purposes of the trigger petition, notwithstanding the unavailability of AYP results for 2014.

18

Our interpretation is consistent with Regulations section 4800, which provides: "The Parent Empowerment regulations shall remain valid in the event of changes to federal law referenced within the legislative language of Chapters 2 and 3 of the 5th Extraordinary Session Statutes of 2010, to the extent allowable under the law." This regulation specifically contemplates changes in federal law, which might affect the Act, and clarifies that the Act remains valid despite such changes. We therefore conclude that the unavailability of an AYP report did not affect the continued viability of the Act, even though that unavailability was the result of a waiver and not a change in federal law as the effect is the same.

Therefore, on this record, and specifically given Palm Lane Elementary School's history of not meeting AYP in nine of the immediately preceding 10 years, the Act remained enforceable as to the trigger petition, notwithstanding the absence of information to evaluate the AYP criterion for 2013-2014. Palm Lane Elementary School thus qualified as a subject school as of January 2015.

The District cites evidence of changes to federal law and contemplated changes in state law after the submission of the trigger petition. Changes and/or contemplated changes to state and federal law, however, do not affect the determination whether a school qualifies as a subject school under the Act; that determination is made at the time a trigger petition is submitted. (See Regs., § 4802.1, subd. (c) ["If, on the date the petition is submitted, a school is identified pursuant to section 4800.1(k), it shall remain a subject school until final disposition of the petition by the LEA [(local educational agency)] even if it thereafter ceases to meet the definition of a subject school, unless that school has exited federal Program Improvement and is at or over 800 on the Academic Performance Index."].)

III.

SUBSTANTIAL EVIDENCE SUPPORTED THE TRIAL COURT'S FINDINGS THE DISTRICT INCORRECTLY DETERMINED THE TRIGGER PETITION WAS DEFICIENT.

At the time the District rejected the trigger petition, it stated that the trigger petition was defective because it did not include a separate document containing the names of the lead petitioners, the requisite language describing the restart model, or the requisite number of parent signatures. The trial court found the trigger petition was not defective in those three respects. Substantial evidence supported the trial court's findings.

A.

*Substantial Evidence Supported the Trial Court's Finding That the Petitioners Submitted a Separate Document That Identified the Lead Petitioners.*

In the opening brief, the District argues the trigger petition, as delivered to the District, was defective because it failed to identify the lead petitioners in violation of Regulations section 4802.05, subdivision (c). The District does not argue that the document, which the Petitioners claimed was submitted with the trigger petition on January 14, 2015, was otherwise deficient in identifying the lead petitioners.

The District argues, "the simple fact remains that at the time the Petition was submitted, Petitioners were required to submit a separate document identifying the lead petitioners. The trial court reverses this obligation in its Order and imposes a duty on the District to search out the identity of the lead petitioners, which is not required by the law. Despite the failure to identify the lead petitioners at the time of submission, once they were identified, the District actually communicated with them, including providing information on the status of signatures not verified and granting an extension to resubmit

20

the petition." The District's argument provides an incomplete and thus inaccurate summary of the trial court's findings and reasoning on this issue.

Regulations section 4802.05, subdivision (c) requires the following: "At the time of submission the petitioners shall submit a separate document that identifies at least one but no more than five lead petitioners with their contact information." The trial court acknowledged the conflict in evidence regarding whether the District received the separate document, and found the Petitioners' evidence showing that the separate document was presented in the binder containing the trigger petition on January 14, 2015, to be more credible. The court stated, "[t]he evidence on the 'lead petitioner list' issue was directly contradictory. The Petitioners said they provided it when they delivered the signed petitions to the District at the District's Office on January 14, 2015. The Respondents said they never got it. After considering all the evidence[,] I resolve this issue in favor of the Petitioners. In particular, I find the testimony of Alfonso Flores to be persuasive and he to be the most credible witness on this issue, and probably in the entire case."

Substantial evidence supported the court's finding. Flores testified the binder containing the trigger petition documents, which was presented to the District's office on January 14, 2015, had inside of it, as the first page, a separate document identifying the lead petitioners and setting forth their respective contact information. He further testified he was present when the binder was assembled and stated, "[a]ll the documents, including the lead petition[er]s" were placed inside the binder within plastic sheet protectors that were three-hole punched and placed within the metal rings of the binder. He further testified he personally observed the binder was not disturbed before it was presented to the District. Paredes testified she saw the separate document listing the lead petitioners inside the binder on the morning of January 14, 2015, before she delivered the binder to the District's office. Romero's letter to Wagner encouraged the

21

District to contact the lead petitioners to help facilitate communication with the Palm Lane Elementary School parent community.

The District's argument that the trial court improperly reallocated obligations set forth in Regulations section 4802.05 is likely based on the trial court's additional comments on this issue, as follows: "I would be remiss however if I left the issue there. The behavior of the Respondents personnel in doing absolutely nothing to determine who the lead petitioners were [cannot] go without comment. Wisely or not, the Act requires the Local Educational Agency (LEA) to work with the lead parent petitioners in the process. In practical terms it means the Districts must cooperate and work together with the very people who seek to take from the District a school (and its funding etc) and to establish in its place a charter school. No clearer repudiation of a school district's performance could be imagined."

The court continued: "I find that the Respondents' claimed ignorance of the identity of the lead parents and ignorance as to how to learn their identity (feigned and contrived ignorance in the Court's view) is unreasonable. They could have looked at the 'sign in sheet' for January 14th when the petitions were delivered to see which parents were there—but they did not. They could have called the name and phone number of the person listed on most of the petition; which information was listed after the words: [¶] 'For more information, all interested persons, the school district, and others should contact:' (emphasis added) [¶] [Name and number omitted by the Court] [¶] And if that was not enough, immediately below the name and phone number of the contact person were the words: [¶] 'Supporting organizations' [¶] with the name of two supporting organizations, one of which is headed by Senator Romero, with whom the evidence showed the Respondents were well acquainted. [¶] Any of those acts would have been what a reasonable person would have done and what a reasonable process would have called for. Instead, they manufactured a continuing state of ignorance as to the lead person identities."

The court concluded its comments on this issue, stating: "Finally, and not to beat a dead horse, Senator Romero herself wrote to Respondents and offered to put them in touch with and coordinate between the District and the lead parents (Exhibit 49, page TX 049-003 to 006). Respondents never responded to her offer. [¶] On July 2, 2015 while testifying before the Court the District Superintendent testified that even on that day she still did not know who the lead petitioners were. The evidence established that Exhibit 97 (list of petitioning parents, i.e. lead petitioners) was again provided shortly after the District findings were announced on February 19, 2015. How she could not know the identities is troubling. [¶] Clearly, the Respondents did not meet their obligations of good faith cooperation with respect to this issue and as mandated by the Act."

The trial court's comments do not reflect any misunderstanding of the legal requirements imposed by Regulations section 4802.05 or the parties' respective burden of proof regarding the submission of the separate document identifying the lead petitioners. Instead, the court's comments reflect its view that, given the District's position the separate document was never delivered, the District's conduct in response was unreasonable and inconsistent with that position such as to affect the District's credibility.

B.

*The Trigger Petition Included a Description of the Restart Model as Required by Regulations Section 4804.*

The District argues that the Petitioners failed to include in the trigger petition the language describing the restart model as required by Regulations section 4802. Regulations section 4802, subdivision (a)(5) requires that the petition and each section of the petition contain "[a] description of the requested intervention using

23

the language set forth in either sections 4803, 4804, 4805, 4806, or 4807, without omission to ensure full disclosure of the impact of the intervention."

Because the trigger petition's requested intervention option is the restart model, Regulations section 4802, subdivision (a)(5) requires that the petition contain language from Regulations section 4804, which describes the restart model as follows: "A restart model is one in which an LEA [(local educational agency)] converts a school or closes and reopens a school under a charter school operator, a charter management organization (CMO), or an education management organization (EMO) that has been selected through a rigorous review process. (A CMO is a non-profit organization that operates or manages charter schools by centralizing or sharing certain functions and resources among schools. An EMO is a for-profit or non-profit organization that provides 'whole-school operation' services to an LEA.) A restart model must enroll, within the grades it serves, any former student who wishes to attend the school." (Regs., § 4804.)

Here, it is undisputed that all the parents who signed the trigger petition were presented with the following statement as part of the trigger petition packet: "Section 4804. Description of Intervention—Restart Model [¶] The restart model is a process with which the Local Education Entity (LEA), restructures a school or closes and reopens it under a charter school operator, a charter management organization (CMO), or an education management organization (EMO), that is selected through a rigorous review process. A CMO is a nonprofit organization that manages charter schools, centralizing or sharing certain functions and resources among schools. (An EMO is a nonprofit organization that provides 'full school management' services for LEA schools). A restart model school must enroll, within the grades it offers, each and every one of the former students who wishes to attend the school." (Boldface & underscoring omitted.)

The District argues that it was justified in rejecting the trigger petition as deficient because the packet, which *the District* had received, primarily was comprised of

24

signature pages and did not include this mandatory language. The District further argues that the requisite language was required for each petition.

It is evident from our review of the record that the parties apply varying definitions to the word "petition" in this case. In some instances, the word is used to refer to the packet presented when soliciting a parent to sign the trigger petition. In other instances, the word is used to refer to the signature page itself. Regulations section 4802, subdivision (a)(5) does not specify the placement of the mandatory language. As pointed out by the Petitioners, the sample petition under the Act prepared by the State Board of Education includes the mandatory language on a separate page from the signature page.

In its decision and order, the trial court found:

"The Petitions were printed in English and Spanish. The testimony was that the signature gatherers were provided packets to be utilized in each contact with a potential petition signer and the packets were given to each person who signed a petition.

"There was a difference in the first paragraph of the petitions. In the English version, on the second to the last line through the end of the sentence, the following words appear: [¶] . . . '(CCR), Title 5, section 4804 and attached to this petition.' [¶] In the Spanish language version everything following '(CCR),' is missing.

"The regulations require that the petition amongst other things contain identification of the requested intervention (§ 4802(a)(4)) and 'a description of the requested intervention using the language set forth in either sections 4803, 4804, 4805, 4806 or 4807 without omission to ensure full disclosure of the impact of the intervention.' (§ 4802(a)(5)[.])

"The contents of the package that went along with each petition contained an extra copy of the petition (in the language appropriate to the signers preferred language) as well as copies of the required regulatory provisions (See e.g. Exhibits 108 and 122).

"Now clearly the required regulatory materials were not attached—they were enclosed within the packet. The evidence convinces the Court that the necessary and required information was provided to the petition signer and discussed with them by the signature gatherers. The testimony of witnesses including Ms. Romero and Mr. Flores regarding the training process, inclusion of materials in the packets, the checking of same to be sure they were complete and the following of instructions by the gatherers are persuasive to the Court and I find them to be credible witnesses. Therefore, I find that the Petitioners substantially complied with the requirements of 5 CCR § 4804 and the Restart Model and the Petitions must not be rejected on this ground."

The District balks at the trial court's finding of substantial compliance, arguing, "the substantial compliance doctrine can only apply 'if a petition omits required material that is not essential to understanding the substance of the challenged [action].'" However, Regulations section 4802.1, subdivision (g) specifically contemplates a substantial compliance standard for trigger petitions under the Act, providing: "Upon receipt, the LEA [(local educational agency)] may, within 40 calendar days, return the petition to the person designated as the contact person or persons as specified in section 4802(c), if the LEA determines any of the following: [¶] . . . [¶] (3) The petition does not *substantially* meet the requirements specified in section 4802. In such a case, the LEA shall immediately provide the contact person written notice of its reasons for returning the petition and its supporting findings." (Italics added.) According to the State Department of Education's Final Statement of Reasons, attached as exhibit A to the Petitioners' request for judicial notice, the substantial compliance language "is necessary to prevent petitions from unfairly being rejected based upon minor technicalities and frustrating the intent of the Parent Empowerment statutes."

We conclude substantial evidence supported the trial court's finding that the trigger petition substantially complied with the mandate of Regulations section 4802, subdivision (a)(5).

C.

*Substantial Evidence Showed the Trigger Petition Contained the*
*Signatures of Parents of One-half or More of Palm Lane*
*Elementary School's Students.*

The District also argues the trigger petition was properly rejected because the Petitioners failed to collect the requisite number of signatures under Education Code section 53300, which requires "at least one-half of the parents or legal guardians of pupils attending the school, or a combination of at least one-half of the parents or legal guardians of pupils attending the school and the elementary or middle schools that normally matriculate into a middle or high school, as applicable, sign a petition requesting the local educational agency to implement one or more of the four interventions." The District informed the Petitioners that, through its verification process, the trigger petition was short 12 signatures.

The trial court disagreed with the District's rejection of the trigger petition on that ground. The court found:

"The Respondents have declared that the Petitioners submitted 355 verified signed petitions (sometimes called valid petitions) but needed to submit 367 such petitions to meet the requirements of the Act. . . .

"Under the Act and its related regulations, the Respondents as an LEA [(local educational agency)] may verify signatures on petitions, but they are not required to do so; and if they undertake to do so their efforts must be reasonable. [Citation.]

"I find that the process set up and utilized by Respondents was unreasonable, unfair and incomplete.

"The process was developed by a temporary employee (Evelyn Gutierrez) who was given no training or education about the Act, the Regulations or the importance of what she was being asked to do. She had no background, training or experience in

27

handwriting analysis or comparison. She was not supervised in any meaningful regard. She received no written procedures to follow. She had to develop the script she used when calling parents phone numbers. The deficiencies in the process used were substantial; so substantial that it made it an unreasonable, arbitrary, capr[i]cious and unfair process. In fairness it must be noted that Ms. Gutierrez did her best in the situation into which she was placed.

"The result of this defective process was that valid signed petitions were not counted. Ms. Gutierrez testified to several petitions she rejected that on reflection should have been determined valid. In addition she testified that a number of petitions were placed by her in a 'pending' status because she could not reach the parent signatory or for some other reason. Someone, not Ms. Gutierrez, later decided to improperly classify those petitions as invalid.

"A brief description of the signature verification process is in order. Ms. Gutierrez would call the phone number twice to try and reach a parent signatory. She called between approximate[ly] 8:30AM and 4:30PM. If she could not reach the person, she would put them in 'pending'. If she reached the parent she inquired about their signing the petition. Calling only during normal working hours for the parents decreased the probability of making contact.

"Some persons reached by phone said they had signed; others said their spouse signed; others said they could not recall if they signed and finally some denied they had signed.

"Some children had separate petitions signed by each parent. If the first petition signature could not be verified there was no attempt to look at the other signed petition to verify the accuracy of the signature on that petition.

"In sum, there are numerous deficiencies in the process. The result of the flawed process was that valid signatures sufficient to reach and exceed the 50% threshold were improperly excluded.

28

"In the interest of brevity I attach and include a list of 29 students and parents utilized in argument and entitled 'Improperly Invalidated Petitions (Child/Parent)'. I have independently evaluated the evidence relating to some but not all of the 29, stopping once a total of 23 additional valid signed petitions were established. Inasmuch as the Respondents determined and found the Petitioners were 12 valid petitions short there is no need to go further. The Petitioners needed 367, the Court finds they presented a minimum of 378. Using the aforementioned chart, the Court determines the following numbers referenced thereon were valid petitions: 1-7; 9; 13-24; 27-29. The Court does not reach items 25 and 26."

In the opening brief, the District does not challenge the court's findings that the trigger petition, in fact, contained the requisite number of valid signatures and does not directly address the court's findings regarding valid petitions that the District determined invalid before rejecting the trigger petition. Instead, the District defends its process and argues there was "insufficient evidence to demonstrate a miscount by the District as of the February 19, 2015 Board determination" and further argues that if only the Petitioners had taken advantage of the District's offer to resubmit the trigger petition, this litigation could have been avoided.

In any event, the Petitioners introduced evidence that paralegal and notary public Sunny Ellen Lee was tasked with verifying the signatures of parents. She testified about the process that she had utilized. Lee testified, inter alia, that she had obtained eight signed declarations (seven of which she had notarized) verifying parent signatures, that were rejected by the District, representing 13 pupils. Four other parents (representing a total of five children) declined to sign a declaration but confirmed to Lee that they had signed the trigger petition.

Substantial evidence therefore supported the trial court's finding that the trigger petition satisfied the parent signature requirement.

IV.

INSUFFICIENT EVIDENCE SHOWED THAT REGULATIONS SECTION 4802,
SUBDIVISION (a)(1) REQUIRED THAT ED REFORM NOW BE IDENTIFIED
ON THE FACE OF THE TRIGGER PETITION.

In the opening brief, the District argues, "[w]hile not an issue identified by the District in rejecting the Petition on February 19, 2015, trial testimony established that undisclosed organizations provided material support to the Petition, the disclosure of which was required for parents to make an information decision." Regulations section 4802, subdivision (a)(10) provides: "The names of any agencies or organizations that are supporting the petition, either through direct financial assistance or in-kind contributions of staff and volunteer support, must be prominently displayed on the front page of the petition."

The Petitioners argue this issue is forfeited because it was not an issue raised when the District rejected the trigger petition and was not raised at trial until the District's closing argument. We do not need to decide whether the District's argument is forfeited because it fails on the merits.

The record does not show that the District requested a statement of decision.[4] Pointing out that the trial court's decision and order cited section 632 of the Code of Civil Procedure, the District asserts the decision and order constituted a statement of decision, suggesting that if not requested, it was issued sua sponte by the

---

[4] In a post-oral-argument letter, the District's counsel states: "Following oral argument, in consultation with trial counsel, the undersigned counsel learned a CCP § 632 statement of decision was formally requested. Discussion of the issuance of a written decision is reflected in the record. [*See* RT at 733:10-13.]" The portion of the reporter's transcript cited by counsel consists of the trial court's statement that the court needed answers to certain questions for purposes of "writing my decision." It does not reflect a request by the District for a statement of decision. The District has not provided any other citation to the record supporting the assertion it requested a statement of decision.

trial court.  (See *In re Marriage of Rising* (1999) 76 Cal.App.4th 472, 476-477, fn. 7 [the court may issue a statement of decision sua sponte].)[5]

Whether the trial court's decision and order should be construed as a statement of decision does not affect the result on this point.  The District neither requested that the court make a finding in a statement of decision whether the trigger petition was required to disclose Ed Reform Now on its face, nor filed an objection or otherwise brought the absence of such a finding in the decision and order to the court's attention.

"Securing a statement of decision is the first step, but is not necessarily enough, to avoid the doctrine of implied findings.  Litigants must also bring ambiguities and omissions in the statement of decision's factual findings to the trial court's attention—or suffer the consequences.  Code of Civil Procedure section 634 states *if* omissions or ambiguities in the statement of decision's factual findings are timely brought to the trial court's attention, 'it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue.'" (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59, italics added.) Here, in light of the absence of any objection to the decision and order, we infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues. (*Id.* at pp. 59-60.)

In any event, for the reasons we explain, insufficient evidence supports the District's claim on this issue.  During cross-examination at trial, Flores testified that he was paid $60,000 for his work on the trigger petition campaign.  He was hired by California Center for Parent Empowerment and had received the compensation from a New York nonprofit organization called Ed Reform Now to which California Center for

_____

[5]   We commend the trial court for its detailed order.  The court's explanation of its factual findings and legal reasoning have been extraordinarily helpful.

31

Parent Empowerment belonged. Evidence was not presented at trial explaining the relationship between these two entities or how it came to be that Ed Reform Now was the entity that transmitted Flores's compensation to him.

The trigger petition identified Romero's organization, California Center for Parent Empowerment, which is itself a party in this appeal; there is no issue on appeal about the adequacy of that designation. Insufficient evidence supported a finding that Ed Reform Now constituted an organization that offered direct financial assistance or in-kind contributions of staff and volunteer support for the trigger petition. The finding now requested by the District could not have been made by the trial court on this record; it is too undeveloped on this point.

V.

THE PETITIONERS WERE NOT REQUIRED TO RESUBMIT THE TRIGGER PETITION.

In the opening brief, the District argues the trial court erred by granting the Petitioners' petition for a writ of mandate because the Petitioners failed to first resubmit the trigger petition to the District, and thereby failed to exhaust their administrative remedies. "In general, a party must exhaust administrative remedies before resorting to the courts. [Citations.] Under this rule, an administrative remedy is exhausted only upon 'termination of all available, nonduplicative administrative review procedures.'" (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080.)

The trial court rejected the District's argument on this point, explaining in its decision and order: "The Respondent Board rejected the Petition in Exhibit 16, which is entitled: [¶] 'Board Findings and Action Regarding parent Empowerment Petition (Palm La[n]e Elementary School)' [¶] Exhibit 16 is dated February 19, 2015. In the section entitled 'Action' the last sentence in relevant part reads 'Accordingly, the Petition . . . is rejected.' [¶] Respondents sought to characterize the rejection as something less,

32

arguing in the trial brief and at trial that the action of February 19th was not a final determination on the Petition . . . . They presented their case in part on the theory that the Petition was returned as allowed under 5 CCR Section 4802.1(g)(j) and not rejected. The language used by the District's Board plainly says otherwise. They rejected the Petition[;] they did not return it. [¶] The Respondents also argue that this Court lacks jurisdiction to hear this matter as well as to grant relief because the Petition was not rejected[—]but only returned[—]and therefore Petitioners have failed to exhaust their administrative remedies. This argument fails because the Respondents rejected the Petition. [¶] I find the rejection to be procedurally unfair, unreasonable, arbitrary and capricious."

Substantial evidence supported the trial court's finding. Notwithstanding the District's verbal invitation to resubmit the trigger petition, the District unequivocally stated in the findings, "the Petition is materially non-qualifying and is rejected as insufficient."

Even if the District had not rejected the trigger petition, but only returned it, the Petitioners were not required to resubmit the trigger petition before seeking a writ of mandate. The District does not cite any regulation requiring any such resubmission, even if the trigger petition contained deficiencies and is returned. (See, e.g., Regs., § 4802.1, subd. (j) ["the same petition may be resubmitted to the LEA [(local educational agency)] with verified signatures as long as no substantive changes are made to the petition"].)

Resubmitting a trigger petition is not without peril—the Regulations afford only a single resubmission opportunity. (See Regs., § 4802.1, subd. (j) ["The petitioners shall be provided one resubmission opportunity which must be completed within a window of 60 calendar days after the return of the petition pursuant to section 4802.1. . . . The resubmitted petition may not contain substantive changes or amendments. If substantive changes are made to the petition, it must be recirculated for signatures before it may be submitted to the LEA [(local educational agency)] and it shall be deemed a new

33

petition."]; see also *id.*, § 4802.05 ["(a) Petitioners may not submit a petition until they reach or exceed the 50 percent threshold based on accurate and current enrollment data provided by the LEA. The date of submission of the petition shall be the start date for implementation of all statutory and regulatory requirements. [¶] (b) *An exception shall be made for a one-time resubmission opportunity to correct a petition* based on errors identified by the LEA, verify signatures after a good faith effort is made by the LEA to do so first, or submit additional signatures. The start date for a resubmitted petition shall be the date it is resubmitted. No rolling petitions shall be accepted by the LEA." (Italics added.)].)

Here, it was the Petitioners' position that the trigger petition met the requirements of the applicable Regulations. In their view, there was nothing to correct. As discussed *ante*, the trigger petition substantially complied with the requirements of the Act. Therefore, the Petitioners were not required to resubmit the trigger petition to the District before seeking a writ of mandate.


## DISPOSITION

The order is affirmed. Respondents shall recover costs on appeal.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.


34