Filed 9/1/23  P. v. Carroll CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096565 |
| Plaintiff and Respondent, | (Super. Ct. No. 04F00144) |
| v. | |
| NICOLE CARROLL, | |
| Defendant and Appellant. | |

In 2005, a jury found defendant Nicole Carroll guilty of murder for her participation in the shooting death of the victim, her ex-boyfriend.  In 2019, defendant filed a petition for resentencing under former Penal Code section 1170.95.[1]  After the trial court denied the petition, this court remanded the case for reconsideration under the correct standard of proof.  The trial court held an evidentiary hearing on remand and again denied the petition, finding defendant was guilty beyond a reasonable doubt of murder as currently defined by the applicable statutes.  On appeal, defendant argues the

---

[1] Undesignated statutory references are to the Penal Code.  Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).  Although defendant's petition refers to former section 1170.95, we will refer to section 1172.6 throughout this opinion.

1

court again applied the wrong burden of proof at the hearing and the court's ultimate findings are not supported by sufficient evidence. We will affirm the trial court's order.

FACTUAL AND PROCEDURAL BACKGROUND

In 2003, defendant and a group of 12 others planned to attack the victim, defendant's ex-boyfriend, in a park. During the attack, one member of the group fired a gun at the victim and killed him. (*People v. Ly et al.* (Sept. 23, 2008, C052280) [nonpub. opn.] (*Ly*).) The jury found defendant guilty of first degree murder (§ 187, subd. (a)) and found true an allegation that a principal in the crime was armed with a firearm (§ 12022, subd. (a)(1)). The jury also found true a lying-in-wait special-circumstance allegation as to a codefendant, Hung Ly (§ 190.2, subd. (a)(15)).

In our opinion affirming defendant's conviction on direct appeal, we provided a detailed summary of the evidence adduced at trial. Because the trial court adopted the summary in its order denying the section 1172.6 petition and both parties rely on the summary in their briefing, we will paraphrase excerpts of the summary for context. More detailed facts from the trial record will be discussed below, as relevant to each issue.

The victim and defendant dated in high school but stopped dating when defendant moved to Los Angeles in 2001. In December 2003, defendant was in the area and dating codefendant John Lam.[2] One evening, "[defendant] called for [the victim], but he was not home. [The victim] received a second call shortly before midnight, after which he asked his mother if he could borrow her Toyota Camry so he could 'see Nicole.' " (*Ly, supra*, C052280.) The victim took the car; police found him early the next morning in a park with two fatal bullet wounds. (*Ibid.*)

---

[2] At oral argument, defendant requested this court take judicial notice of the record in Lam's case. All requests for judicial notice must be made in writing (Cal. Rules of Court, rule 8.809) and, in any event, the materials lack relevance here. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379 fn. 2; *Ochoa v. Anaheim City School Dist.* (2017) 11 Cal.App.5th 209, 222.) Accordingly, defendant's request is denied.

"Six immunized witnesses--Quoc Lam, Sieu Nguyen, Johnson Phan, Dac Su, Davis To and Damon Voong--testified about a meeting that took place at Voong's house on the evening of December 23, during which the plan was hatched to attack [the victim] at Tahoe Park. Sometimes their versions coincided; often their testimony conflicted not only with each other, but with the same witness's prior statements." (*Ly, supra*, C052280, fn. omitted.) Codefendant Lam said the victim made "disparaging remarks about Asians in phone calls to [defendant], saying things like 'fuck Asians' and referring to them as 'Chinks.' " (*Ibid.*) Codefendant Lam called his cousins Quoc Lam[3] and To and told them defendant would lure the victim to the park, where they would "jump him." (*Ibid.*)

Quoc Lam brought nunchakus and golf clubs to the house. "[Defendant] said she wanted [the victim] beaten up because she did not like him. [Codefendant] Lam explained that [the victim] would meet [defendant] at Tahoe Park, that the group should wait for him to get out of his car and then jump him. . . . There was some discussion at the house about Cooc and Ly having guns." (*Ly, supra*, C052280.) Defendant called the victim, then she and codefendant Lam told the group to leave for the park. (*Ibid.*) The group traveled in three vehicles, as follows:

| Acura RSX | Honda Pilot | Honda Accord |
|---|---|---|
| **John Lam** (*driver*)*<br>**Nicole Carroll*** | **John Dich** (*driver*)*<br>**Jimmy Chi Cooc***<br>**Hung Thieu Ly***<br>Johnson Phan<br>Sieu Nguyen<br>Damon Voong<br>Tommy Vu | Quoc Lam (*driver*)<br>Dac Su<br>Davis To<br>Johnny Truong |
| *Defendant[']s [and codefendants'] names appear in boldface type. | | |

---

[3] Because John Lam and Quoc Lam have the same surname, we will refer to Quoc Lam using his full name.

The group in the Honda Pilot "had a conversation about a gun." (*Ly, supra*, C052280.) Cooc and Ly both passed their guns around in the SUV. (*Ibid.*) Once they arrived at the park, defendant met with the victim and "talked for a few minutes. [The victim] reached for [defendant], but she pulled away." (*Ibid.*) The victim returned to his car, and the Honda Pilot and Acura RSX moved to block the victim into his parking space. (*Ibid.*)

"Ly got out of the Pilot and pulled a gun from his waistband. Cooc also got out of the car with his gun drawn. Vu threw a Heineken bottle, which hit the Camry. Ly stood in front of the Camry and pointed his gun at the front windshield saying, 'Don't move' or 'stop, stop, stop.' Some witnesses thought [the victim] revved the engine and the Camry may have moved forward a little.

"Ly fired at least three shots at the Camry. The first shot was fired at the front windshield, the second shot from the driver's side door, and the third from behind the Camry by the trunk. The group then returned to their vehicles and drove back to Voong's house. On the way back, Ly exclaimed, 'I got him in the head,' or 'I got him, I got him. He almost ran me over.' Ly also said, 'I did what I had to do,' and 'if he hadn't of moved, I wouldn't have shot him. He almost ran me over.'

"Back at the house, [defendant] smiled and said something to the effect of 'Oh, well, I didn't like him anyways.' About a week later, Lam called To and said he had spoken with a homicide detective and that he (To) should keep his story straight." (*Ly, supra*, C052280.)

We affirmed defendant's conviction on direct appeal. (*Ly, supra*, C052280.)

In 2019, defendant filed a petition for resentencing under section 1172.6. She alleged her conviction was based on the natural and probable consequences doctrine as the theory of murder, with a target crime of assault, and that she could no longer be convicted of murder under sections 188 and 189, effective January 1, 2019. The trial court issued an order to show cause, held an evidentiary hearing, and denied the petition.

4

Defendant appealed and this court reversed the order, concluding the trial court had considered only whether defendant "could" still be convicted of murder, rather than acting as an independent fact finder deciding whether defendant was, in fact, still guilty of murder beyond a reasonable doubt. (*People v. Carroll* (Oct. 28, 2021, C092527) [nonpub. opn.].)

On remand, the trial court held a new evidentiary hearing. The court observed it had "previously ruled that a reasonable jury could have convicted the Defendant," but that it was the court's "responsibility to actually make that finding, and that's what this hearing is about today." The prosecutor argued defendant could still be found guilty under a theory she aided or abetted an implied malice or lying in wait murder. Defense counsel argued the prosecution could not establish malice under either theory. Defense counsel acknowledged that To testified defendant was aware some of the codefendants had guns before they left for the park but argued "everyone else" testified otherwise. The court observed it could elect to believe the testimony of one witness over other witnesses. The court took the matter under submission.

The trial court denied the petition in a written order. The court explained it was acting as an independent fact finder and assessing whether defendant was guilty of murder beyond a reasonable doubt. The court recited the summary of facts from the direct appeal opinion, saying the summary was consistent with its review of the trial transcripts. The court also considered a transcript of Lam's 2019 parole hearing, which defendant had submitted with her moving papers.

The trial court explained the elements of aiding and abetting a lying-in-wait murder and said based on the record, "it is possible to see [defendant] did have an intent to kill." Defendant lured the victim to the park and into a position of vulnerability, knew of the firearms her codefendants possessed, and had a callous attitude after the murder. Lam held himself out as a gang member and summoned many people to attack the victim, so defendant would have recognized the dangerous situation. The court determined

5

defendant "is guilty beyond a reasonable doubt of first degree murder by directly aiding and abetting Ly lying in wait."

The trial court also concluded defendant was "guilty beyond a reasonable doubt of implied malice murder based upon an aiding and abetting theory." The court observed defendant participated in the discussion at Voong's house about the attack, and concluded she was aware that Ly and Cooc had firearms before leaving. She was present at the park when the attack plan was modified and lured the victim into a vulnerable position where she knew armed individuals were waiting. She knew she was "facilitating harm to [the victim], that could include his death." Thus, defendant was guilty of murder and ineligible for relief.

Defendant timely appealed the trial court's order. The case was fully briefed on April 13, 2023, and assigned to this panel on April 25, 2023.

DISCUSSION

I

*Burden of Proof*

Defendant argues the trial court found only a "reasonable possibility" that she was guilty, rather than finding each element of murder was established beyond a reasonable doubt, and thus applied the incorrect burden of proof. We disagree.

This court previously considered the appropriate burden of proof in this case. We explained, "Senate Bill No. 1437, which took effect on January 1, 2019, limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to ensure that a person's sentence is commensurate with his or her individual criminal culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842-844.) Prior to the passage of Senate Bill No. 1437, under the natural and probable consequences doctrine, a defendant was 'liable for murder if he or she aided and abetted the commission of a criminal act (a target offense), and a principal in the target offense, committed murder (a nontarget offense) that, even if unintended, was a

6

natural and probable consequence of the target offense.' [Citations.] Senate Bill No. 1437 amended section 188 to clarify that malice may not be imputed to a person based solely on his or her participation in a crime. (§ 188, subd. (a)(3).) Thus, pursuant to Senate Bill No. 1437, where the felony-murder rule is not at issue, a person must act with malice to be convicted of murder. [Citation.] [A]s relevant here, defendant is eligible for relief under section [1172.6] if she could no longer be convicted of first or second degree murder due to changes to sections 188 and 189 made by Senate Bill No. 1437. [Citation.]" (*People v. Carroll, supra*, C092527.)

"When, as here, the trial court determines that the petition for resentencing establishes a prima facie case for relief, the court must issue an order to show cause and then conduct a hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts. (§ 1172.6, subds. (c), (d)(1).) At the hearing, the prosecution bears the burden to prove beyond a reasonable doubt that the defendant is guilty of murder under current law . . . . The trial court, acting as an independent fact finder, must determine, beyond a reasonable doubt, whether the defendant is guilty of murder under a theory that remains valid after Senate Bill No. 1437. [Citation.]

"Following the passage of Senate Bill No. 1437, the Governor signed Senate Bill No. 775 (2020-2021 Reg. Sess.), which went into effect on January 1, 2022. (Cal. Const., art. IV, § 8, subd. (c).) As particularly relevant here, Senate Bill No. 775 '[r]eaffirms that the proper burden of proof at a [section 1172.6] resentencing hearing . . . is proof beyond a reasonable doubt,' and that a finding there is substantial evidence to support a conviction is insufficient to meet this burden. (Stats. 2021, ch. 551, §§ 1-2; see § 1172.6, subd. (d)(3).) Because the trial court's order denying defendant's petition for resentencing is not yet final, [s]he is entitled to the benefit of the amendments to section 1172.6 effectuated by Senate Bill No. 775. (*People v. Porter* (2022) 73 Cal.App.5th 644, 652 . . . .)" (*People v. Garcia* (2022) 82 Cal.App.5th 956, 965-966.)

7

Both at the evidentiary hearing and in its written order, the trial court stated it would be acting as an independent fact finder and deciding whether defendant was guilty of murder under a valid theory beyond a reasonable doubt. The court also asked defense counsel how it should go about weighing witness credibility given the state of the record, which would be unnecessary if it were considering only whether there was merely a "possibility" defendant could be convicted of murder. Moreover, the ultimate findings the court made plainly set forth a finding of defendant's guilt beyond a reasonable doubt. We interpret the court's statement "it is possible to see that [defendant] did have an intent to kill" to mean the court could see an avenue to finding intent to kill beyond a reasonable doubt, rather than as a statement of the burden of proof the court was applying. We see no error in the court's application of the burden of proof.

II

*Insufficient Evidence*

Defendant argues the trial court made several factual findings that are not supported by the record, and the court's ultimate finding that defendant acted with malice is not supported by sufficient evidence.[4] We disagree.

A. *Additional Background*

Of relevance here, Davis To, Lam's cousin, testified at trial. To's testimony at trial frequently differed from his testimony at the preliminary hearing and his statements to police officers, and counsel on both sides frequently referred to his earlier statements to refresh his recollection and/or impeach his testimony.

To testified that Lam called him the evening of the murder and told him the victim had been using racial slurs. Lam said he wanted to "kick the dude's ass." To gathered

---

[4] Defendant separates her insufficient evidence claims into two separate issues, one of which is targeted at specific factual findings made by the trial court and another which addresses the court's findings of malice. Because the factual findings are relevant to the court's ultimate findings as to malice, we will address the issues together.

8

with the others, including defendant, outside Voong's house. Members of the group brought golf clubs and nunchakus to beat the victim up. To told a police detective that Ly said something about having a gun, but at trial To claimed, "now that I think about it I don't remember hearing him say that."

To also told the detective Cooc had a gun and Cooc showed the gun to him. His testimony was the same at the preliminary hearing. At trial, To denied these statements, saying Cooc's comment about having a gun was "just a thought in my head," and, "now that I think about it [Cooc] didn't show [the gun] to me."

To shifted his testimony on cross-examination, saying there was no discussion of weapons before going to the park, but then reversed himself on redirect examination, saying defendant was present when Cooc and Ly talked about having guns. He admitted knowing the defendants and said he did not want to say anything that could hurt them.

When the three cars arrived at the park, the group waited and talked about "the plan" to beat the victim up. They initially split up to look for the victim and to make it seem as if they were not together as a group. Lam later called them and changed the plan, saying defendant would "go out" and "distract" the victim so the others could attack him. The group assembled at one side of the park, accordingly.

After the shooting, they returned to Voong's house and defendant was acting "[c]heerful." She was smiling and appeared "crazy."

To spoke with a police detective approximately three weeks after the murder. He said he had talked to Lam about a week after the murder; Lam said he had spoken with a police detective and To should keep his "story straight."

Other witnesses testified there had not been any discussion about guns while at Voong's house.

9

The trial court also considered a transcript of codefendant Lam's 2019 parole hearing.[5]  Among other things, Lam discussed his gang activity at the time of the crime, including his associations with gang members and his gang tattoos.  At least some of the group members from the night of the shooting were active gang members, and Lam committed other crimes with them in the past.  Lam gave Ly the gun used in the shooting, six months before the crime was committed.  Lam did not remember any discussion at Voong's house about Cooc and Ly having guns.

B. *Analysis*

We review a trial court's factual findings on a section 1172.6 petition for substantial evidence.  (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)  "[W]e must 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.)  Our job on review is different from the trial judge's job in deciding the petition.  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.  (*People v. Vargas* (2022) 84 Cal.App.5th 943, 952.)  " 'Before setting aside the judgment of the trial court for insufficiency of the evidence, it must clearly appear that there was no hypothesis whatever upon which there was substantial evidence to support the verdict.' " (*Ibid.*)

"To prove first degree murder of any kind, the prosecution must first establish a murder within section 187 — that is, an unlawful killing with malice aforethought."

---

[5] The version of the transcript in the record is incomplete; it is unclear if the trial court had a more complete version.

10

(*People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1262 (*Maldonado*).) "Malice is either express or implied. (§ 188, subd. (a).) Express malice is a deliberate intent to unlawfully kill. (*Id.*, subd. (a)(1).)" (*People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 500.) "[M]alice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Ibid.*) Implicit in this formulation "is that the natural consequences of the act entail a significant risk of death." (*Id.* at p. 501.)

" 'Thereafter, pursuant to section 189, the prosecution must prove the murder was perpetrated by one of the specified statutory means, including lying in wait . . . ' [Citation.] To prove the murder was perpetrated by means of lying in wait, the prosecution must prove ' " ' "(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage. . . ." ' " ' " (*Maldonado, supra*, 87 Cal.App.5th at p. 1262.)

"Unlike first degree premeditated murder, 'nothing in section 189 requires the lying in wait to have been done with the intent to kill.' (*People v. Laws* (1993) 12 Cal.App.4th 786, 794 . . . (*Laws*).) Instead, 'If the act which the perpetrator intends to commit while lying in wait results in a killing which satisfies the elements of murder, it is immaterial whether the perpetrator intended to kill . . . . ' (*Id.* at p. 795.) 'Ordinarily, . . . [an implied malice] killing would be murder of the second degree. However, if this murder is perpetrated by means of lying in wait, it is, by statutory definition, murder of the first degree.' (*Id.* at p. 794.) 'All that is required of lying in wait is that the perpetrator exhibit a state of mind equivalent to, but not identical to, premeditation and deliberation. [Citation.] This state of mind simply is the intent to watch and wait for the purpose of gaining advantage and taking the victim unawares in

11

order to facilitate the act which constitutes murder. [Citation.] It does not include the intent to kill . . . .' [Citation.]" (*Maldonado, supra*, 87 Cal.App.5th at pp. 1262-1263, fns. omitted.)

" '[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' (*People v. Powell* (2021) 63 Cal.App.5th 689, 712-713, . . . fns. omitted (*Powell*).) Direct aiding and abetting an implied malice murder remains a valid theory after the amendments of Senate Bills 1437 and 775." (*Maldonado, supra*, 87 Cal.App.5th at p. 1263.) "Factors to be considered by the trier of fact in determining 'whether one is an aider and abettor include presence at the scene of the crime, failure to take steps to attempt to prevent the commission of the crime, companionship, flight, and conduct before and after the crime.' " (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273.)

Substantial evidence supports the trial court's finding defendant acted with implied malice to directly aid and abet the murder. Defendant instigated the initial conflict by telling codefendant Lam the victim had used racial epithets about Asians and, specifically, about Lam. After Lam assembled a large group, which included several gang members, defendant told the group they would be jumping the victim because she did not like him. She would lure the victim to the park, where the group could attack

him. She thus knew she was instigating an attack involving multiple perpetrators on an unsuspecting victim.

Defendant was present for a discussion about bringing guns and other weapons to the attack. Even after this discussion, she contributed to the plan, speaking to the victim on the phone to get him to the park. She, along with Lam, then directed the group to head to the park. Once at the park, defendant kept the group informed about the victim's position and drew the victim out of his car for a conversation, knowing the group had maneuvered into a position to trap him. Defendant, therefore, continued to be an active participant in the plan, despite knowing that weapons, including firearms, could be involved. Finally, defendant's cheerful conduct and glib remarks after the shooting are suggestive of a callous disregard for the victim's life. Based on these facts, a rational fact finder could conclude defendant aided and abetted a life-endangering act with knowledge of the significant risk the act entailed, which is sufficient to find defendant acted with implied malice.

Defendant takes issue with three specific factual findings in the trial court's order, including the findings that defendant was aware Cooc and Ly had firearms, knew of Lam's gang affiliation, and was "present at the park when the plan to attack [the victim] was modified." As to defendant's knowledge of the firearms, we disagree there is "simply no evidence" supporting the trial court's conclusion. While several witnesses testified there was never any mention of firearms before the attack, one witness, To, testified defendant was present for a discussion at Voong's house where Cooc and Ly mentioned their guns. Despite To's shifting statements and frequent reliance on previous statements to refresh his recollection, resolving such credibility issues is within the trial court's prerogative, and "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment" on appeal based on insufficient evidence. (*People v. Hutchinson* (2018) 20 Cal.App.5th 539, 546.)

13

Defendant also asserts the trial court's finding that defendant was aware of codefendant Lam's gang connection is unsupported, and is contradicted, by the record. The evidence of Lam's gang membership, which is entirely drawn from the transcript of his parole hearing, does suggest he held himself out as a gang affiliate to his peers. He had gang tattoos and associated with gang members. While he made efforts to conceal his affiliation from his parents, he "acted another way at school." His older brother, a former gang member, noticed his behavior and tried to discourage him. Defendant attended school with Lam and associated with him closely enough that he felt he was in competition with the victim for her attention. On the evening of the attack, he also enlisted several gang members to join his group. Thus, even if there was no direct evidence defendant was aware of his gang affiliation, it was reasonable for the trial court to infer her knowledge. Such inferences can constitute substantial evidence. (*People v. Wharton* (1991) 53 Cal.3d 522, 548.)

Defendant challenges the trial court's finding she was "present" at the park when the attack plan was "modified," saying there is no evidence the plan was modified, and defendant was "some distance away" when the attack occurred. As noted above, however, To testified there was a change in the plan after they arrived at the park; Lam called him and told him to come to the other side of the park so defendant could distract the victim. The change in plan was communicated while defendant was in the car with Lam, so she would have been "present" for the change. To the extent her presence during the change in the plan was reflective of her active participation in the victim's ambush, it is supported by substantial evidence.

Finally, at oral argument, defendant argued *People v. Reyes* (2023) 14 Cal.5th 981 requires reversal in her case because the defendant there had greater involvement in the crime than did defendant here. As an initial matter, we disagree defendant lacked sufficient involvement in her crime in comparison to Reyes; as noted above, here defendant was the precipitating cause and an active participant in the life-endangering

14

act.  More importantly, however, *Reyes* rejected the trial court's decision there because the trial court relied on a misunderstanding of aiding and abetting implied malice murder that omitted "proof of the aider and abettor's knowledge and intent with regard to the *direct perpetrator's* life endangering act."  (*Reyes*, at p. 991.)  Here, the trial court made no such error, followed the guidance of *Powell, supra*, 63 Cal.App.5th 689, which the Supreme Court cited with approval in *Reyes* (*Reyes,* at pp. 990-992), and analyzed defendant's mental state as to the shooting.  Thus, *Reyes* does not compel a different outcome.

## DISPOSITION

The trial court's order denying the section 1172.6 petition for resentencing is affirmed.

/s/
———————————
Duarte, J.

We concur:


/s/
———————————
Earl, P. J.


/s/
———————————
Hull, J.

15